# Pennsylvania Railroad Company, Appellant, *v.* City of Reading.

*Practice, C. P.—Change of venue—Public prejudice—Cause— Act of March 18, 1909, P. L. 37, Section 1.*

1. Before a change of venue will be allowed under the Act of March 18, 1909, P. L. 37, Section 1, relating to cases to which the county or a municipality therein is a party and where local prejudice is shown to exist, or where a large number of the inhabitants of the county have an interest adverse to the applicant, it must appear to the court that a fair and impartial trial cannot otherwise be had. A change of venue will not be granted unless real necessity is shown.

2. An application for change of venue of a condemnation proceeding in which a city had taken certain property of plaintiff railroad company, was properly refused where the lower court found that an impression had been gained by the public as a result of certain statements issued by representatives of the plaintiff, due to a misunderstanding of fact, that the land in question was to have been unconditionally given to the city by the plaintiff, that thereafter it appeared that there was a condition to the gift and the gift was not ultimately made; that the newspapers of the city took active sides in the controversy which resulted, and in number they were equally divided in their attitude toward the action of the plaintiff; that none of the hostile publications complained of were made shortly before the trial; and it did not appear that there was any deliberate coöperation between the city or its officials and the newspapers to work up a sentiment in the community antagonistic to the rights of the plaintiff for compensation for the taking of its property, and it further appeared that the opinions of most of the witnesses who testified in support of the application for the change of venue were based largely on the verdicts in the first two of the six condemnation proceedings in which plaintiff made claim for damages.

Argued May 2, 1916.   Appeal, No. 452, Jan. T., 1915, by plaintiff, from judgment of C. P. Berks Co., March T., 1913, No. 60, dismissing plaintiff's application for change of venue in case of The Pennsylvania Railroad Company v. The City of Reading.   Before MESTREZAT, POTTER, MOSCHZISKER, FRAZER and WALLING, JJ.   Affirmed.

Petition for change of venue.

ENDLICH, P. J., filed the following opinion:

Some years ago the County of Berks was entering upon the construction of a new bridge over the Schuylkill river at Penn street, according to plans involving the coöperation of the City of Reading.   The convenience of the public, as well as other considerations, required the widening of Penn street on each side of the approach to the bridge from Second street westwardly, which could only be ordained by the city.   The improvement being for the manifest benefit of both, the city and county arranged between them jointly to pay the damages accruing to property holders by reason of the appropriation of their real estate, the city one-fourth and the county three-fourth.   Among the properties affected were several belonging to the plaintiff railroad company, whose passenger station is at the foot of Penn street.   There were negotiations between the county and the railroad company, conferences between the county and city authorities, and correspondence between the latter and representatives of the company, touching the terms upon which the latter would consent to the surrender of the portions of its properties needed for the public use.   A waiver of damages was contemplated on all hands.   Unfortunately a condition imposed by the plaintiff company's superintendent of the Schuylkill Valley division at one of the very early interviews with the county commissioners that the local street railway company be given a franchise to construct a loop around the

approach of the bridge, bringing the track and cars close to the passenger station seems not to have been brought to the notice of the plaintiff company's legal department into whose hands the matter passed, nor to the attention of the city. Out of this circumstance arose an all-around misunderstanding, accentuated when, in answer to an inquiry by the city solicitor as to whether the company desired security for its damages, the plaintiff's counsel addressed to him a communication on Nov. 17, 1911, declaring the receipt by him from his company of an expression of its intent to dedicate, without looking for compensation, so much of its Penn street property as was needed for the widening of that thoroughfare; thus creating the impression on the public mind that there was to be a free and unconditional gift to the city of the company's land for that purpose. By and by it was ascertained by the railroad authorities in charge of the matter that the condition above mentioned had been made and overlooked, and the same being regarded as vital to the company's interests, it was deemed necessary to reassert and insist upon it. The city was accordingly advised of this qualification of the previous offer. There followed considerable public discussion on the subject in the newspapers and at public and partly public meetings, at which representatives of the railroad appeared explaining the attitude of the company. The sentiment of the meetings was mainly favorable to the latter. An ordinance was passed by the city councils accepting its condition, but was vetoed by the mayor. Thereupon ensued more discussion, principally in the newspapers. In all there appeared in various of these upwards of 60 publications on the subject, including articles, communications, and mere reports of meetings, etc. Some dealt unfavorably, some few acrimoniously with the railroad company, some apologetically or favorably, and others earnestly and sharply criticised the stand taken by the city officials. In siding with the one view or the other,

indeed, they were pretty evenly divided.   Further legis-
lation in the direction of the vetoed ordinance succeeded
in select, but failed in common council.   Proceedings were
then instituted in behalf of the company to assess dam-
ages to it in respect to six properties affected, and viewers
appointed by the court in each of the six proceedings
made awards to plaintiff on April 24, 1913, aggregating
$31,000.00.   On April 26, 1913, the Herald, a newspaper
of the City of Reading having a circulation of about
6,000, published an article, headed "When is a gift not a
gift?   When there's a string tied to it, is the answer."
The substance of the article, which refers to the mayor's
veto message and the awards of the viewers, is that the
plaintiff company had offered the property uncondition-
ally as a gift to the city and that the condition annexed
to it was a repudiation of its original offer.   As support-
ing that assertion it reproduces in fac simile the letter of
Nov. 17, 1911, which at its request had been furnished
to it by the city solicitor.   The city appealed from the
awards of the viewers.   Something over a year ago, two of
the six cases (Nos. 59 and 62, March T., 1913) were tried
together in this court.   The damages allowed by the jury
were not satisfactory to the plaintiff, but the court did
not see its way clear, for that or other reasons assigned,
to setting the verdicts aside and ordering new trials, and
the judgments entered were, on appeal, affirmed by the
Supreme Court: Penna. R. R. Co. v. Reading, 249 Pa.
19.   Now the plaintiff asks that for the trial of the re-
maining cases the venue be changed.   To the rule entered
upon its petition in each of these cases an answer had
been filed, and depositions have been taken on both sides.
Those submitted by defendant (together with the de-
nials of the answer) effectually dispose of any suggestion
of deliberate coöperation between the city or its officials
and the newspapers to work up a sentiment in the com-
munity antagonistic to the demand of the railroad com-
pany for compensation in these cases.   On the part of the

plaintiff there are the depositions of several witnesses
relied upon to show that such a sentiment was created
and still subsists. These witnesses give it as their opin-
ion that because of the facts above narrated and the im-
pressions and feeling resulting from them, the plaintiff
railroad company was involved in the then unpopularity
of the street railway company for which it was suspected
of endeavoring to secure indirectly an advantage that
could not have been obtained directly; that a prejudice
thus engendered against the plaintiff company's demand,
or against the company with respect to its demand, sur-
vives at this time; and that by reason of it, the plaintiff
company cannot have a fair and impartial trial of these
cases in this county. All but one of the witnesses base
this opinion largely upon the verdicts in the two cases
already tried and above referred to. All of them refer to
the unfavorable newspaper comments as at the time and
presumably still operating to plaintiff's prejudice. None
of them avers, much less instances, any recent expression
or manifestation (aside from the verdicts mentioned) of
hostility or disfavor towards the plaintiff company or
its right to recover adequate compensation.

The applications for change of venue are made under
Act of March 18, 1909, P. L. 37, Sec. 1, Par. 4 (relating
to cases to which the county or a municipality therein is
a party and where local prejudice is shown to exist)
and par. 5 (relating to cases in the question involved
in which a large number of the inhabitants of the county
has an interest adverse to the applicant); the require-
ment under both of these clauses, in order to sustain the
application, being that it "appear to the court" that a
fair and impartial trial cannot be had. Neither the fact
of the county or one of its municipalities being a party,
nor the circumstance that a large number of the inhabit-
ants is interested in the question involved, is decisive.
In connection with either there must "appear to the
court" the impossibility of a fair and impartial trial.

Doubtless the opinions of witnesses in a position to form such are evidence upon that question demanding respectful consideration; but their force and effect are to be judged of by the court in the light of its own knowledge and experience, and of the reasons upon which the witnesses base their views. The court must be satisfied that they are well grounded and borne out by what is alleged as supporting them. No authority need be cited to fortify this proposition.

In so far as the opinions here urged in support of plaintiff's applications are based upon the result of the two cases already tried, they do not seem entitled to persuasive effect. Those cases were subjected by plaintiff's counsel to a searching criticism, with a view to establishing bias on the part of the jury owing to the city solicitor's mention of the letter of Nov. 17, 1911—the likelihood of such bias thereby being sought to be predicated upon substantially the same facts and arguments that are adduced to support these applications. The outcome was the approval of the cases by the Supreme Court. It would be strange if they could now be made to serve as proof of the existence of an unrighteous influence dictating their decision by the jury and liable to control that of the suits pending.

Beyond this matter we have nothing but the supposition that an unfavorable impression created several years ago has been kept alive in the community and continued or become sufficiently general and intense to amount to an obstacle to plaintiff's obtaining justice at the hands of a jury in this county, however carefully selected, guarded and instructed. None of the witnesses professes to have in mind any recent utterances of citizens adverse to the plaintiff or its demand. Two of them recall comments made upon the verdicts already referred to, but, it seems, by way of criticism of them because below the awards of the viewers—i. e., expressions favorable, not unfavorable to plaintiff. All of them emphasize the newspaper publications adverse to the company as the

main ground of their belief. Quite apart from the conceivable contrary effect of those that were favorable, it is to be remembered that, as pointed out authoritatively, the influence of newspaper publications upon the state of the public mind, however potent at the time, "is necessarily short-lived": Com. v. Smith, 185 Pa. 553, 568. Nor does there seem to be any reason for excepting from this statement what one of plaintiff's witnesses characterizes as the "spectacular" publication of the fac simile letter. The important parts of the letter had, with the writer's approval, been published in the Reading Eagle, another newspaper of the city, on Nov. 18, 1911. There is nothing per se prejudicial or offensive in a fac simile reproduction. Its ordinary effect is simply the elimination of questions of accuracy and possibly an increase of conspicuousness. In order to make the effect attributed to the newspaper publications by the witnesses appear as a reality to the court, it would seem that there ought to be some proof of the actual and present existence of an unfriendly sentiment by means of recent expressions of feeling, opinions, or prejudices, traceable to the cause stated—something to indicate with a reasonable degree of directness and positiveness that an adverse impression made by the publications at the time is still active in the minds of the people. Without anything of that kind the utmost deference to the personal beliefs and opinions of the witnesses called by plaintiff will not justify the court in declaring that, from any of the causes mentioned, prejudice against plaintiff "appears to the court" to exist and that a fair and impartial trial cannot be had. This makes it unnecessary to consider the effect, under Burns v. Penna. R. R. Co., 222 Pa. 406, of the participation of plaintiff's representatives in the public discussions heretofore spoken of, thereby at least recognizing the propriety and need of discussion.

When we come to the allegation that many of the inhabitants of the county have an interest adverse to plaintiff in the question involved in these suits, etc., the mat-

ter seems still plainer. The only "interest" averred in the petitions, or deducible from the proofs, or relied upon in plaintiff's argument, is the interest of the taxpayers of the county, qua taxpayers, in the result of the actions. Whatever the precise definition of the "interest" meant by the statute may be (see Brittain v. Monroe County, 214 Pa. 648, 651; Huntingdon County Line, 14 Pa. Superior Ct. 571, 578; Oakland v. Oakland Water Front Co., 50 Pac. 268; Graziani v. Burton, County Supt., et al., 97 S. W. 800, it is not that of taxpayers merely. This is clearly implied in Brittain v. Monroe County, ubi supra, was distinctly held by Judge Mc-Clure in Lewisburg Bridge Co. v. Union & Northumberland Counties, 37 Pa. C. C. Rep. 73, and must be so unless the authorization of a change of venue under this provision of the Act of 1909 is to be regarded as a means of indirectly and practically nullifying Sec. 6, Act of April 16, 1840, P. L. 410, forbidding one's interest as a taxpayer to disqualify him as a juror in any cause in which the county, etc., shall be a party or concerned—an enactment from which assuredly that of 1909 was not intended to derogate.

Finally, in judging of the practicability of a fair trial, it is needful to reckon with a due exercise of the right of challenge: Everson v. Sun Co., 215 Pa. 231, 234. Any element of prejudice or interest of less sweeping proportions than that contemplated by the statute as ground for a change of venue may be neutralized by a careful selection of the jury; and this, as appears from the decision just cited, is a determining consideration in the absence of a clear and convincing establishment of the allegations made in support of the application, and wherever the facts proven do not amount to a positive bar to a fair trial. All the cases show that a change of venue is not granted lightly or without real necessity; one of the very obvious reasons being the great additional burden of expense and inconvenience entailed by a trial in another county. If that is of moment where there is

but one case in question, it is of much graver moment where there are four, which are not claimed to be triable together and the costs in which must fall upon the defendant, who is resisting the removal.

Our conclusion is that it does not appear to the court that local prejudice exists against the plaintiff, or that a large number of the inhabitants of this county has an interest in the question involved adverse to the plaintiff, or that the latter cannot have a fair and impartial trial here, and consequently a change of venue is to be refused. It is, however, deemed advisable to limit this decision, for the present, to the one case, above entitled. Its trial may afford further information both to the parties and to the court, valuable in the disposition of the applications in the remaining cases, with which, if need be, this one may by proper methods again be included.

The rule to show cause is discharged.

The lower court dismissed plaintiff's application for change of venue. Plaintiff appealed.

*Error assigned,* among others, was in discharging plaintiff's rule for change of venue.

*Cyrus G. Derr,* for appellant.

*Joseph R. Dickinson,* with him *Ira G. Kutz,* for appellee.

PER CURIAM, May 15, 1916:

The order is affirmed on the opinion of the learned president judge of the court below discharging the rule to show cause why a change of venue should not be granted.