STATE *v.* BERT STACY.

February Term, 1932.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 4, 1932.

384

386

*W. W. Lapoint* and *Gelsi Monti* for the respondent.

*Lawrence C. Jones,* Attorney General, and *C. O. Granai,* State's attorney, for the State.

MOULTON, J. The respondent has brought this case before us on exceptions following his conviction of the crime of murder in the first degree. The victim was his wife, Ruth Stacy.

The first question relates to an exception taken to the denial of a motion for change of venue. The motion was addressed to the county court at the term then in session, and during which the case was marked for trial. It was based upon two newspaper articles, appearing in different publications a few days prior to the commencement of the trial, in each of which it was stated that the respondent had offered to plead guilty to murder in the second degree, but that the State had refused to accept the plea. It was alleged that the two newspapers had a large circulation in the county and that it would be impossible to select twelve jurymen who had no knowledge of the contents of the articles, and that, in order to qualify them by interrogatories, respondent's counsel would find it necesary specifically to refer to the articles.

It has been said, that at common law, a court possesses the inherent power to change the venue of a cause pending before it, when it clearly appears that a fair and impartial trial cannot be had in the county where the venue is laid, and statutes which specifically confer this power are merely declaratory of the common law. *Crocker* v. *Justices of Superior Court,* 208 Mass. 162, 94 N. E. 369, 375, *et seq.,* 21 Ann. Cas. 1061. This rule is, no doubt, supported by the weight of authority, but a different doctrine obtains in this jurisdiction. In *State* v. *Howard,* 31 Vt. 414, 415, a petition for a change of venue of a trial upon an indictment for manslaughter was brought on the ground that a fair trial could not be obtained because of the excitement and disordered public opinion in the county regarding the case. It was held that neither the Supreme Court nor the county court had jurisdiction to grant the petition since the statute provided, in general terms, that a criminal case should be tried in the county where the offense was charged to have been committed and that it would require the interference of

the Legislature in order that there might be a change of the place of trial to another county. The matter is now regulated by statute. By G. L. 2523 it is provided that: "When a person is under information or indictment for an offense punishable by death or imprisonment in the state prison, the respondent or the state's attorney of the county where the prosecution is pending, may apply to a superior judge, petitioning that the trial of such respondent be removed to and had in another county." And by G. L. 2525, "the judge to whom the application is preferred, may, in his discretion, by an order in writing, direct that the trial of such respondent be removed to and had in some other county named."

Thus, the county court had no power to grant the motion. A superior judge presided, but there were two assistant judges with him, and these three constituted the court. The assistant judges are not a part of the tribunal erected by the statute with authority to hear and grant applications of this nature. For this reason, if for no other, the motion was properly denied. ·

At common law, a motion for change of venue was not to be granted on mere suggestion, or unless the reason was fully established. *Crocker* v. *Justices of Superior Court, supra*, page 377 of 94 N. E., 208 Mass. 162. As we have seen, by G. L. 2525, the determination of the matter rests in the discretion of the superior judge to whom the application is made. If we suppose that the motion was treated by the superior judge who presided at the term as being presented to him as such, under the statute (G. L. 2523), and not to the county court, no error appears. The ruling, being discretionary, is not to be revised unless an abuse of discretion is shown. *Pierce* v. *Mitchell*, 87 Vt. 538, 540, 90 Atl. 577. The contrary not appearing, we must presume that the discretion was exercised, since the law required it. *Murray* v. *Nelson*, 97 Vt. 101, 110, 122 Atl. 519; *Schlitz* v. *Lowell Mut. Fire Ins. Co.*, 96 Vt. 337, 342, 119 Atl. 513. The test is whether the discretion was exercised on grounds or for reasons clearly untenable, or to an extent clearly unreasonable, for to do this would constitute an abuse. *Dyer* v. *Lalor*, 94 Vt. 103, 116, 109 Atl. 30; *Schlitz* v. *Lowell Mut. Fire Ins. Co., supra*.

No supporting affidavits were filed with the motion, nor, so far as appears by the record, was there any request that testimony should be taken. The motion itself was not verified.

The newspapers referred to were attached to it, and an examination shows nothing of an inflammatory or denunciatory nature, but only a report that the respondent's counsel was understood to have offered a plea of guilty to murder in the second degree, which, it was believed, was for the purpose of obtaining a sentence of life imprisonment, and avoiding the death penalty, but which, it was learned, the State had refused to accept.

Newspaper articles, even though denunciatory in character, are not in themselves and in the absence of some evidence of the actual existence of a prejudice against the accused, sufficient to require the judge, in the exercise of his discretion, to conclude that a fair and impartial trial cannot be had. *Downs* v. *State,* 111 Md. 241, 73 Atl. 893, 896, 18 Ann. Cas. 786; *Pennsylvania R. R. Co.* v. *City of Reading,* 254 Pa. 110, 98 Atl. 791, 792, 793, Ann. Cas. 1918E, 562. No answer or counter affidavit was filed by the State, but this did not oblige the judge to adopt the inferences and opinions contained in the motion, or to treat the allegations as sufficiently proved. He was at liberty to draw his own inferences and reach his own conclusions. The motion itself was not evidence of the matters it recited. *Central Vermont Ry. Co.* v. *Carpenter,* 86 Vt. 67, 69, 83 Atl. 466. So, assuming that the motion had been presented to the authorized tribunal, no abuse of discretion is made to appear. The exception is not sustained.

Early in the trial the presiding judge ruled that, unless permission were given to do otherwise, all objections should be made from where counsel stood, and that they would not be allowed to state their claims at the bench, out of hearing of the jury. The respondent briefs an exception to this ruling, claiming that thereby his counsel were compelled to make statements in the hearing of the jury, which should not have come to their attention. It is doubtful that an exception was in fact taken to the ruling, but we treat the question as being properly before us.

This was a matter within the discretionary power of the court to supervise the general conduct of the cause on trial. The prohibition was not absolute, but required only that permission to do otherwise should first be asked and obtained. Several instances are cited in the respondent's brief, which are claimed

to show enforced harmful statements before the jury, but in none of them was permission requested to approach the bench, and, further then that, we fail to perceive the prejudice which the respondent attributes to them. The exception is not sustained.

The crime was committed on the farm of Louis Sweeney, in the town of Berlin, on April 18, 1931, between 6.15 and 6.35 P.M. The respondent and the deceased were married about five years before and lived together in the city of Barre. The deceased had a daughter, Alta Slack, the issue of a prior union, and a son Gordon Stacy, was born about a year after the marriage. The respondent and his wife separated in January, 1931, and the latter went to the Sweeney farm, where she was employed as housekeeper. She took the children with her. Later on Gordon was sent to be cared for elsewhere, but Alta remained with her mother. On April 16, 1931, the respondent was arrested and charged with failure to support his wife. He was in court on that day and on the next, and was released upon his own recognizance pending the disposition of the case.

William Emslie, a clerk in Lander's sporting goods store in Barre, testified that, about 1.15 P.M. on April 18, he sold to the respondent a .32-calibre revolver, and a box of .32-calibre Remington "clean bore" cartridges. Edward Casey, who had known the respondent for a number of years, testified that he was present in the store at the time, saw a revolver being wrapped up and handed to the respondent by Emslie, overheard some conversation between them concerning the question whether the cartridges would fit the weapon, and saw the respondent leave the store with two packages. George Lander, the proprietor of the store, testified that he was present, and knew of a sale of a revolver and cartridges, but could not say to whom, because he was otherwise engaged at the time. John Morley said that at one or two o'clock that afternoon, he met the respondent on the street and walked beside him, and that the respondent left him in front of, or near, the Lander store.

The Sweeney farm is situated about four and one-half miles southerly from Montpelier, upon a side road which branches out from the Montpelier-Northfield cement highway. John Murray and Lawrence Griggs testified that they saw the respondent sometime between half-past three and quarter-past four in the after-

noon, walking south along the main highway, about two miles south of Montpelier. Doris Crozier and her mother, Mrs. Mary Crozier, identified him as the man whom they saw on that afternoon turning off the main highway, opposite their house, into the road leading to the Sweeney farm, and walking rapidly in that direction.

On the morning of April 18, Louis Sweeney, Mrs. Stacy, Alta Slack, and their neighbors, Mrs. Willette and her children, and James McCormick, went to Montpelier in Sweeney's truck. In Montpelier they were joined by George Willette, and all returned to the Sweeney farm arriving there at about six P.M. Mrs. Stacy and Alta got out, and went into the house. After putting chains on the truck wheels, Sweeney took the Willettes to their home, and McCormick walked away to his own home. Alta Slack testified that she and her mother changed their clothes, and the latter went out toward the barn, and that just as she was finishing dressing, after her mother had gone out, the respondent came in and asked her where her mother was; she answered ''Maybe she is down to the barn,'' and the respondent went in that direction; that afterwards he came back, and said, ''Did you see your mother yet?'' and she answered, ''no''; thereupon he said, ''Wait just a minute,'' and shot her; then he went away, and she got up and went out to the barn, and found her mother lying on the ground, outside. In a few minutes Sweeney came back and found Mrs. Stacy alive, but unconscious, and Alta bleeding from a wound in the chest. His testimony to this effect was corroborated by McCormick, who returned to the farm, and the sheriff who arrived soon afterwards, having been called by Sweeney. Mrs. Stacy was shot twice, once in the back, and once through the brain. Her hat was found on the floor of the cow stable. Alta was shot through the body, a fresh mark on the wall of the room showing where a bullet had struck. A bullet was found on the window sill.

No witness saw the respondent returning from the Sweeney farm. He was found and taken into custody about 8.30 that evening, walking towards Montpelier from another direction, but there was a hill road leading from the Sweeney farm which connected with the road where he was found. After being taken to the jail he was questioned by the officers and gave a voluntary statement which was taken down in writing and signed by him.

In it he denied having purchased the revolver and ammunition, and denied the possession of a revolver, but said that he had some cartridges which he had purchased in Plattsburg, N. Y., before his marriage. He denied having been in the Lander store at any time during the year. He denied having gone to the Sweeney farm, and having been on the Northfield road or having passed the Crozier house that afternoon. He accounted for his movements during the afternoon by saying that he had come from Barre to Montpelier between three and four o'clock and since that time had been trying to find a friend of his, who as he was informed, had some cider. He denied, however, having had anything to drink. He said that he was "pretty mad" because his wife had caused him to be arrested for non-support, and that he had no reason to suspect anyone of shooting his wife. Dr. J. C. O'Neil, an alienist, who, during the week before the trial, examined the respondent to determine the question of his sanity, testified that the latter gave him an account of his movements during the afternoon of April 18 substantially the same as that included in his statement.

The respondent's defense was that he did not shoot his wife, but that if he did he was temporarily insane at the time and governed by an irresistible impulse, caused by information he had received concerning her improper relations with other men, and certain incidents which he had observed which corroborated that information. He took the stand and testified that he did not remember where he was or anything that he did on April 18; that he did not remember buying a revolver and cartridges, and that he did not remember making a statement at the jail; on cross-examination he said that he remembered being found by the officers and taken to jail, and thought that he had been going to a friend's house to get something to drink but had not got there, and that he did not remember where he was just before meeting the officers. He also said that he did not remember his conversation with the alienist. He testified that he knew the difference between right and wrong, and knew that no one had any right to kill his wife, and that it was wrong to do so, and wrong to shoot Alta. Throughout his statement and his testimony, the respondent professed deep affection for his wife and for Alta.

394

The exceptions briefed, other than those which we have already considered, relate to questions as to the competency of Alta Slack to testify; rulings upon evidence; the conduct and arguments of counsel; and certain instructions given by the court to the jury. These various groups will be given attention in the order named.

Alta Slack was offered as a witness on behalf of the State, and after an examination as to her competency the court directed the administration of the oath to her, subject to the respondent's exception. She was between six and seven years old, but the law fixes no limit of age which a child must reach in order to be competent as a witness. The question was whether she had sufficient intelligence and sense of the duty of telling the truth to enable her to testify. *Commonwealth* v. *Ramage*, 177 Mass. 349, 58 N. E. 1078; *Commonwealth* v. *Robinson*, 165 Mass. 426, 427, 43 N. E. 121; *Wheeler* v. *United States*, 159 U. S. 523, 524, 525, 40 L. ed. 244, 247, 16 Sup. Ct. 93; 1 Wigmore Evidence (2nd ed.) para. 505. In these cases and in other decisions which it is not necessary to cite, children six years old and even younger, were held competent to testify. The question of the competency of a witness is a preliminary one for the court to decide. *Cairns* v. *Mooney*, 62 Vt. 172, 173, 19 Atl. 225; *Chadwick* v. *Wiggin*, 95 Vt. 515, 516, 116 Atl. 74. This rule is to be applied in the case of infancy of a witness. *Commonwealth* v. *Reagan*, 175 Mass. 335, 337, 56 N. E. 577, 78 A. S. R. 496; *Wheeler* v. *United States*, *supra*. The decision rests in the discretion of the court, and is not to be disturbed unless it appears to have been erroneous or founded upon an error in law. *Shields* v. *Vermont Mut. Ins. Co.*, 102 Vt. 224, 248, 147 Atl. 352. It was proper to take into consideration the manner of the child and her apparent possession or lack of intelligence, and these things ''cannot be photographed into the record,'' as is said in *Wheeler* v. *United States*, *supra*. The matters to which she testified occurred only about a month before the trial, and it may be presumed, were fresh and clear in her recollection. Indeed, they were of a nature calculated to impress her mind. We find no error in the ruling.

Furthermore, the jury were fully instructed concerning the weight to be given her testimony, and told that it should be carefully scrutinized in view of the youth of the witness, the

impressionable character of the childish mind, and the well-known fact that, although children are not as a rule deceitful, yet in infancy the strength of the imagination is out of all proportion to the power of the other faculties; and warned against being led by natural sympathy to give it greater weight than it fairly deserved. The rights of the respondent were fully safeguarded, and he has no cause to complain.

Louis Sweeney, after relating what had taken place after he found the body of Ruth Stacy, upon his return to the farm, testified that he and the sheriff went up stairs to the room where Alta Slack was heard crying, and, subject to respondent's exception, was permitted further to testify that she was in bed, undressed, with blood upon her chest over her lung. The sheriff gave substantially the same evidence, also under exception. The ground of the exception was that the offered evidence was not material, relevant, or competent, as the case then stood. But it was clearly material as tending to prove one step in the State's theory of the case, that after shooting his wife, the respondent had attempted to destroy the little girl, because she was the only witness who, to his knowledge, could testify to his presence at the farm. Later on, without objection, except as to her competency, which we have already discussed, Alta Slack testified that her stepfather, after his return to the house from the vicinity of the barn, shot her, and that after finding her mother she went upstairs, took off her clothes and went to bed. The respondent conceded that she had been shot through the body. The nurse who attended her, described the wound and the course of the bullet.

The fact that this evidence tended to show an offense other than the one charged against the respondent did not affect its admissibility, since it legitimately tended to support the charge for which he was on trial. *State* v. *Donaluzzi*, 94 Vt. 142, 145, 109 Atl. 57. The shooting of the child was so related to the shooting of the mother as to shed light upon the latter act and to give aid to the jury in determining how and by whom it was committed. *State* v. *Winters*, 102 Vt. 36, 59, 145 Atl. 413; *State* v. *Sargood*, 77 Vt. 80, 85, 86, 58 Atl. 971.

So, also, the testimony of Eugene Kennedy that he measured the heights of the scars of the wounds on the child's chest and back from the floor, as she was standing with her

shoes on, and found them to be 38 inches and 35 inches respectively, was material and properly received. This evidence corroborated Alta's story that she stood facing her father when he shot her, and tallied closely with height of the mark on the wall, claimed to have been made by the bullet after it had left her body. The evidence also bore upon the question whether the bullet, found upon the window sill by one of the deputy sheriffs, was the one which had inflicted the wounds. The nurse testified that the bullet traversed her body in a downward direction, and the respondent conceded that the scar on her chest was caused by it.

James McCormick was asked on redirect examination when he first learned that Alta had been injured, and subject to an exception on the ground of immateriality, answered that it was when the sheriff came down stairs after going to her room. If this was in fact immaterial, certainly it does not appear wherein the respondent was harmed by it. Immateriality alone, when no resulting prejudice is made to appear, does not constitute reversible error. *Fletcher* v. *Wakefield*, 75 Vt. 257, 263, 54 Atl. 1012.

By several exceptions, which are briefed, and therefore may be considered together, the respondent attacks the admissibility of the evidence which tended to show that, at about quarter-past one on the afternoon of the day of the crime, he purchased a .32-calibre revolver and a box of .32-calibre Remington "clean bore" cartridges. In support of these exceptions it is argued that there was no evidence tending to show that the bullets fired at Mrs. Stacy and Alta Slack had or could have been fired from a .32-calibre revolver, or from the revolver so purchased, or, indeed, from any revolver. It does not appear from the transcript that any of these objections were stated when the exceptions were taken, and, they are therefore unavailable. *State* v. *Fairbanks*, 101 Vt. 30, 39, 139 Atl. 918, and cases cited.

However there was no error in the ruling. It was entirely proper to receive evidence of the purchase of the revolver and ammunition shortly before the homicide, for this tended to show premeditation. *State* v. *Doherty*, 72 Vt. 381, 389, 48 Atl. 658, 82 A. S. R. 951. There was no such lack of evidence connecting the weapon with the crime as the respond-

ent contends. Two bullets were taken from the body of Mrs. Stacy at the time of the autopsy. State's Exhibit 13 was removed from her back, and State's Exhibit 14 from her brain, the latter being the one which inflicted the fatal wound. State's Exhibit 16 was the bullet found upon the window sill in the house, and which the evidence tended to show was the one by which Alta Slack was wounded. Exhibit 13 weighed 73 grains; Exhibit 14, 76 grains; and Exhibit 16, 84 grains. All were deformed. Exhibit 13 measured .3 to .32 of an inch in diameter; Exhibit 16, .31 to .32; and exhibit 14 was broken into several pieces and was so misshapen that it could not be measured, but its size could be compared by the jury with the size of the others, and warranted the inference that it was approximately the same. There was evidence that a bullet would be "wasted," or reduced in size by having a part of its substance grazed off in the process of being fired. The jury were clearly warranted in finding that the fatal bullet, as well as the others mentioned, was .32-calibre and had been fired from a weapon of that bore. The purchase of a .32-calibre revolver and a box of .32-calibre cartridges, at the same time, warranted the inference that the two were fitted to be used together, especially in view of the testimony that something was said between the respondent and the salesman, at the time, concerning the use of the cartridges in the revolver. Although there was no expert evidence that Exhibits 13, 14, and 16, had actually been fired from the revolver, since the latter article was never found, the evidence which tended to show that the respondent had possessed such a weapon and cartridges, shortly before the homicide, that he was present at the Sweeney farm, and that the bullets which wounded both Mrs. Stacy and Alta Slack were of .32-calibre, was amply sufficient to sustain the finding that the fatal shot had come from the respondent's revolver.

There is another ground upon which the admission of the evidence of the purchase may be sustained. Shortly after his arrest the respondent was questioned by the officers, and denied having bought the revolver and cartridges. He said that he did not possess a revolver, but had some cartridges which he had purchased prior to his marriage, some six years previous. It had appeared in evidence that "clean bore" cartridges were placed in the market for the first time in 1928, three years be-

fore the homicide. It was proper to prove that the respondent had knowingly falsified, for this tended to show a consciousness of guilt. *State* v. *Bradley,* 64 Vt. 466, 470, 24 Atl. 1053; *State* v. *Harrison,* 66 Vt. 523, 528, 29 Atl. 807, 44 A. S. R. 864; *Commonwealth* v. *Trefethen,* 157 Mass. 180, 199, 31 N. E. 961, 24 L. R. A. 235.

What has been said about the size and weight of the various bullets disposes of the question of the admissibility of Exhibits 13, 14, and 16.

The sheriff was asked, "Did Alta tell you at that time (when she was discovered wounded upon the bed) who had shot her—just answer yes, or no?"

The question was allowed, subject to exception, and the answer was, "Yes." The same question had previously been asked and the same answer given by the same witness, without objection, and so, if error, no harm resulted. *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 117, 119, 130 Atl. 758; *Herrick* v. *Town of Holland,* 83 Vt. 502, 512, 77 Atl. 6.

The original complaint charging the respondent with failure to support his wife, filed in the city court of Barre, and upon which he had been arrested two days before the homicide, was admitted in evidence, subject to respondent's exception. This was material as tending to show a motive for the crime, especially in connection with the evidence that the respondent had said that he would not support his wife, and his own admission that he was angry because the complaint had been filed. The fact, urged by him, that the complaint was pending and that no disposition had been made of it, does not affect the question. Neither is it a valid objection to say that it did not appear that Mrs. Stacy made the complaint or caused it to be made. That the respondent understood this to be the case may be inferred from his statement that he thought his wife should have talked it over with him, and that he was "pretty mad" because she had caused his arrest upon the charge.

Dr. J. C. O'Neil, duly qualified as an expert on insanity, was called as a witness by the State and testified that he had examined the respondent at the jail upon two successive days during the week before the trial. He gave the details of his examination and read the notes which he had taken at the time.

He was then asked the following question "Basing your answer on what you heard yesterday, that is, his testimony yesterday and this morning, and basing your answer on your examination of him in jail on these two occasions, have you some opinion as to whether or not Bert Stacy is sane or insane?" The presiding judge added to this "And so far as your previous examination of him in jail, confine your answer to such things as you have testified here in Court, as the basis of your opinion." The witness was allowed to answer, subject to exception, that he had such an opinion, which was that the respondent was sane.

 It is urged that this evidence was immaterial, since the issue was respondent's sanity on April 18, and not his sanity at the time of the trial, about a month later. But mental condition at the time in issue may be inferred from evidence of mental condition existing within a reasonable period before or after that time. *In re Estate of Clogston,* 93 Vt. 46, 56, 106 Atl. 594. Whether the evidence related to a time too remote is a question ordinarily directed to the discretion of the court. *Johnson* v. *Doubledey,* 92 Vt. 267, 269, 270, 102 Atl. 1038; *Niles* v. *Central Vermont Ry. Co.,* 87 Vt. 356, 360, 361, 89 Atl. 629; *State* v. *Doherty,* 72 Vt. 381, 390, 48 Atl. 658, 82 A. S. R. 951; *McKenzie* v. *Boutwell & Varnum,* 79 Vt. 383, 388, 65 Atl. 99. Like all other discretionary rulings, it is not subject to revision unless an abuse is made to appear.. None is perceived in this instance.

 It is further claimed that the question was faulty because it did not include substantially all the undisputed facts in the case bearing upon the issue. But this was not necessary. The question was not inadmissible because it included only a part of the facts which the evidence tended to prove, and any omission only affected the weight to be given to the evidence. *McKinstry* v. *Collins et al.,* 74 Vt. 147, 153, 52 Atl. 438; *State* v. *Doherty,* 72 Vt. 381, 392, 48 Atl. 658, 82 A. S. R. 951.

 Again, the respondent says the question was objectionable in that it did not assume the truth of the testimony given by the respondent and used by the witness as part of the basis for his opinion. It is enough to say that this objection was not made on trial, and so is not available here. *State* v. *Fairbanks, supra; State* v. *Turley,* 87 Vt. 162, 173, 88 Atl. 562.

Furthermore, the witness was not, under the circumstances, obliged to assume that the respondent's testimony was true.

Indeed, if there were error in the admission of the evidence, it does not appear how the respondent could have been harmed by it. He did not claim that he was insane at the time of the trial, but that, if he committed the homicide, he did so while in a state of temporary mental derangement.

While Dr. O'Neil was narrating the conversation which he had had with the respondent at the jail, he testified that the latter remarked that one of the officers had told him that Alta said, ''Daddy did it.'' An exception was taken to this, but the testimony was permitted to stand. There was no error. The evidence was not put forward as proof that what the officer had said was true, but only as a portion of the conversation upon which the witness based, in part, his opinion as to the respondent's sanity.

After the respondent had been taken into custody, but before his formal arrest, the sheriff, along with certain of his deputies, went to the respondent's room in Barre and searched it, without a warrant. They found, and took with them, a box containing .32-calibre Remington ''clean bore'' cartridges, and a pasteboard box containing a cleaning brush and a small bottle of oil. The box of cartridges was identified by Emslie, the salesman, as the one which he sold to the respondent and was marked for identification ''State's 20.'' The other box was identified by the same witness as the one in which he had placed the revolver when he delivered it to the respondent, and which at that time had also contained a cleaning brush and bottle of oil. It was marked for identification ''State's 22.'' An envelope containing some loose cartridges from the box marked State's 20, and another one containing a bullet taken from one of the cartridges, were received as State's Exhibit 17 and State's Exhibit 15, respectively. All of the evidence relating to these articles was received subject to respondent's exception upon the ground that they had been obtained by means of an illegal search, and that he was thereby being compelled to give evidence against himself in violation of his constitutional rights. State's 20 and 22, after being identified, were not offered in evidence, and later on, at the request of the State, Exhibits 15 and 17 and all the testimony taken in regard to

them, and to State's 20, was struck from the record, and the jury instructed to disregard it. The respondent, however, insists upon his exceptions, claiming that there was error which was not cured by the subsequent action of the court.

There was no reason why the evidence should have been struck from the record. It was material and admissible. The objection that the articles had been obtained by a search conducted without a warrant, is without merit. The legality of the search was not involved. *State* v. *Suiter,* 78 Vt. 391, 395, 396, 63 Atl. 182; *State* v. *Krinski,* 78 Vt. 162, 165, 166, 62 Atl. 37; *State* v. *Barr et al.,* 78 Vt. 97, 101, 62 Atl. 43. When evidence is offered, the court will take no notice of how it was obtained, whether legally or illegally, whether properly or improperly, nor will it form a collateral issue to try that question. *State* v. *Mathers,* 64 Vt. 101, 102, 23 Atl. 590, 15 L. R. A. 268, 36 A. S. R. 921; *Barrett* v. *Fish,* 72 Vt. 18, 20, 47 Atl. 174, 51 L. R. A. 754, 82 A. S. R. 914; *Comm.* v. *Dana,* 2 Met. (Mass.) 329, 327; *Comm.* v. *Tucker,* 189 Mass. 457, 470, 76 N. E. 127, 7 L. R. A. (N. S.) 1056; *Comm.* v. *Tibbetts,* 157 Mass. 519, 521, 32 N. E. 910; 4 Wigmore, Evidence (2nd ed.) para. 2183, 2264; Greenleaf, Evidence (16th ed.) para. 254, a. And see Wigmore "Evidence Obtained by Illegal Search and Seizure," 8 *Am. Bar Ass'n Journal,* 479. The fourth and fifth amendments to the federal Constitution, relating to unreasonable search and seizure, and freedom from self-crimination, are not restrictions upon the powers of a state, but were intended to operate solely on the federal Government. *Brown* v. *New Jersey,* 175 U. S. 172, 174, 44 L. ed. 119, 120, 20 Sup. Ct. 77; *Spies* v. *Illinois,* 123 U. S. 131, 166, 31 L. ed. 80, 86, 8 Sup. Ct. 22; *In re Dewar,* 102 Vt. 340, 346, 148 Atl. 489; *State* v. *Felch,* 92 Vt. 477, 483, 105 Atl. 23; *In re Consolidated Rending Co.,* 80 Vt. 55, 79, 66 Atl. 790, 11 Ann. Cas. 1069; *State* v. *Giberson,* 99 N. J. Law, 85, 122 Atl. 724, 725. The corresponding provisions of our State Constitution (Articles 10 and 11) do not prevent the admission in evidence of things, the possession of which tends to show the guilt of a respondent, even though obtained from him by means of a search without a warrant. *State* v. *Suiter, supra; State* v. *Krinski, supra; State* v. *Barr et al., supra.* The holding in *State* v. *Slaymon,* 73 Vt. 212, 50 Atl. 1097, 87 A. S. R. 711, by which a private letter taken from a respondent against his will

was held inadmissible in evidence against him, has been in effect overruled by the subsequent decisions in the Suiter and Barr Cases.

Therefore it appears that the ruling by which the evidence was struck from the record was a mere gratuity to the respondent, to which he was not legally entitled, and he has no cause to complain of its original admission. The exceptions are not sustained. This also disposes of the respondent's claim of error in receiving the testimony relating to State's 22 and permitting it to remain on the record.

The respondent also excepted to the admission in evidence of the written statement signed by him, on the ground that certain parts of it were connected with, and influenced by, the articles unlawfully seized and his knowledge that they were in the possession of the officers, and to the allowance of a question asked him upon cross-examination relative to the contents of the pasteboard box (State's 22). The argument for the claimed error in these instances is answered by what we have already said.

State's Exhibit 21 was a box of .32-calibre Remington "clean bore" cartridges. It was produced by George Lander, the proprietor of the store where the evidence tended to show that the respondent had purchased the revolver and ammunition, and who testified that it was, so far as he knew, from the same lot as the box which was sold to a person in his store between 12 and 2 o'clock on the afternoon of April 18. Emslie, the clerk, testified that the cartridges were similar to those which he sold to the respondent. An exception was taken to the admission of this exhibit, but it is not sustained. The evidence was clearly relevant and proper since it tended to identify and describe the ammunition which the State claimed was used in the commission of the crime. The respondent says that Exhibit 21 was so connected with State's 20 that when the evidence concerning the latter was struck from the record, the former became inadmissible, but an examination of the record does not substantiate this claim.

The respondent's son, a child of four years of age, was brought into the court room during the direct examination of the respondent, and his counsel asked him, "Who is this?" The respondent answered: "My boy." The next question was "What is his name?" and the respondent said, "Gordon," and

then, addressing the child, "Come to daddy." The Attorney General objected, stating as his reason, that this was done for the purpose of prejudicing the jury. An exception was taken to this remark, but it is without merit. The respondent had interjected something that was not called for by the question, and entirely immaterial to the issue. The comment of the Attorney General was not without reasonable foundation.

In his argument to the jury, counsel for the respondent said that the written statement signed by the respondent was taken at the time when a detective slapped the respondent's face. The court refused to permit this argument, and reminded counsel that it was not supported by the evidence. An exception was taken, but an examination of the transcript shows that the court was right about the matter. The incident referred to took place at two o'clock in the morning of the day following the arrest and was prompted by a profane epithet used by the respondent to the detective. The latter afterwards admitted to the respondent that he had been hasty. No further violence appears except such as was necessary to restrain the respondent from kicking the detective in the stomach. The statement was taken down and signed during the following afternoon. No error appears.

In describing to the jury the manner in which the State claimed that the shooting was done, the State's attorney exclaimed, "bang, bang," evidently referring to two revolver shots. It is argued that this was improper because there was no evidence that there was, or that anyone heard such a sound. This is altogether too trivial a matter to require our attention.

In the argument of the Attorney General, after commenting upon the examination of the respondent by Dr. O'Neil, and claiming that the former was then attempting to induce the belief that he was insane, attention was called to the fact that the respondent's counsel had been consulting with him during the trial. An exception was taken, upon the ground that such consultations were proper. Of course they were, as the court remarked at the time. But the point of the argument was that this conduct was inconsistent with the defense of insanity existing at the time of the crime; and with the erratic conduct of the respondent at Dr. O'Neil's visit to him. As we have seen, the mental condition of the respondent at the trial was material

as having some bearing upon his claimed derangement on the prior date. The jury had the right to consider his appearance and actions and his apparent interest and participation in the trial, upon this question. The fact that it was not claimed that the respondent was then insane did not make the argument improper. The exception is not sustained.

So, too, the argument that the respondent had attempted to cause Dr. O'Neil to believe that he was insane was justified in view of the evidence of his peculiar conduct and expressions at the time of the examination.

Later in his argument the Attorney General said: "If you are not satisfied beyond a reasonable doubt that this respondent is guilty as charged, then by your verdict say 'not guilty' and open the doors of this court room and allow this respondent to go free, and then go home, gentlemen, and look your wives and your sweethearts and your mothers in the eye, and tell them what you have done." An exception was taken, and the Attorney General withdrew the argument with an apology and asked the jury not to consider it. In the charge the court instructed the jury to disregard it. The argument was improper, but the mischief was cured by its withdrawal and the subsequent instruction of the court. *Woodhouse* v. *Woodhouse,* 99 Vt. 91, 144, 130 Atl. 758; *Fadden* v. *McKinney,* 87 Vt. 316, 326, 89 Atl. 351; *Cunningham* v. *Bradford Agricultural & Trotting Ass'n,* 84 Vt. 35, 37, 77 Atl. 913; *Herrick* v. *Holland,* 83 Vt. 502, 513, 77 Atl. 6; *State* v. *Suiter,* 78 Vt. 391, 397, 63 Atl. 182. The fact that the court did not immediately instruct the jury concerning the matter, but waited until the charge was given, does not, under the circumstances, affect the question. *LeClair* v. *M. & W. R. R. Co.,* 93 Vt. 92, 100, 101, 106 Atl. 587. We cannot assume that the jury did not give due weight to what the court had said. *State* v. *Foss,* 100 Vt. 32, 35, 36, 134 Atl. 636. It is not made to appear that prejudice resulted, and the exception is not sustained. *Wittig* v. *Burnap,* 99 Vt. 340, 342, 132 Atl. 39; *Russ* v. *Good,* 92 Vt. 202, 205, 207, 102 Atl. 481.

An exception was taken to the statement of the Attorney General in argument to the effect that no murder was more atrocious than the one in question, and that, from the circumstantial evidence in the case, it could not have been otherwise than that the respondent never gave his wife an oppor-

tunity to plead before shooting her. We cannot say that this was an unreasonable inference. The evidence tended to show that Mrs. Stacy went to the barn, and that the respondent also went in that direction. Mrs. Stacy's hat was found on the floor of the cow stable. Her body was lying outside, about 30 feet from the barn. She was shot in the back, but this wound would not have produced death or paralysis. The fatal shot entered the top of her head. It was fairly to be inferred that the respondent found her in the barn, and either then shot her in the back, and pursued her as she fled toward the house, or shot her as she did so, and then, standing above her, after she had fallen, inflicted the wound which had caused her death. The short time during which all this occurred warranted the claim that no opportunity had been given her to plead or remonstrate. The comment upon the atrocity of the crime was not unfair. The exception is not sustained. We have considered it without regard to the point that the objection was too indefinite to reserve any question for review.

██ ██ The Attorney General also said that the respondent testified that he had some clean bore cartridges, and that the sheriff had testified that he had told him that he had them, but that it had developed that this sort of cartridges was not placed on the market until 1928. This argument was permitted subject to exception. In his written statement the respondent said that he had some .32-calibre S. and W. cartridges which he had purchased before his marriage. On the stand he was shown State's Exhibit 21, the box containing .32-calibre Remington "clean bore" cartridges, which had been produced by the witness Lander, and identified as like those which had been sold on the afternoon of the crime, and testified that it was similar to the box which he had. The sheriff testified that he told him that he had "clean bore" cartridges. The variation between the testimony and the statement in the argument was too trifling to afford a reasonable ground of objection, and the exception is without merit. *Carleton* v. *Fairbanks & Co.*, 88 Vt. 537, 554, 93 Atl. 462. The argument did not, as the respondent claims, bring before the jury the evidence which had been struck from the record. Moreover, no ground was stated for the exception, and this alone would be a reason for holding it unavailable.

*Miles* v. *Fruit Co.,* 98 Vt. 1, 16, 124 Atl. 559; *Usher* v. *Severance,* 86 Vt. 523, 530, 531, 86 Atl. 741.

An exception was also taken to the argument of the Attorney General wherein he said that the respondent was a wholesale liar and had perjured himself and that the defense was a fabricated one and should not be given consideration. Such a denunciatory method of advocacy is not at all to be commended, and we take this occasion to express our disapproval of it. Yet the evidence introduced by the State, including the conflicting statements of the respondent, was so at variance with the defense that the Attorney General was justified in claiming that the respondent had not told the truth, and that his defense was not based upon fact and was consciously a false one. See *State* v. *Gomez,* 89 Vt. 490, 498, 96 Atl. 190. The fault in the argument lies in its manner and not in its substance. As we have elsewhere pointed out, prejudice must affirmatively appear before a reversal is required, and we do not find that such is the case here. The exception is not sustained.

The comment by the same counsel upon the inability of the respondent to meet his eye while testifying was not improper, because it was based upon his appearance upon the stand, while giving material evidence. *State* v. *Rivers,* 84 Vt. 154, 156, 78 Atl. 786; *In re Bean's Will,* 85 Vt. 452, 459, 82 Atl. 734; *State* v. *Nelson,* 91 Vt. 168, 170, 99 Atl. 881.

The respondent introduced evidence tending to show that he was under the influence of liquor upon the day of the homicide. He requested the court to instruct the jury that if they should find that he shot and killed Ruth Stacy, and at the time of the shooting was so far under the influence of liquor as to be incapable of forming a specific or deliberate intent to kill her, or as to dethrone the reason or overcome his power to control his actions or to distinguish between right and wrong, then the act would not be murder in the first degree. The court refused to comply with these requests, and charged that if it should be found that, on that day, the respondent's mental faculties were so impaired that he was unable to understand the nature and consequences of his acts, and while in that condition, and before the shooting, he became intoxicated, and such mental derangement and intoxication continued until he shot Ruth Stacy, he should be found not guilty by reason of insanity; but if it should

be found that his mind was not impaired, the fact of his intoxication would not in any way affect the grade or degree of his guilt, ''for the voluntary intoxication of one who, without provocation, commits a homicide, although his intoxication may amount to a frenzy, does not excuse him from the same construction of his conduct and the same legal inferences, as affecting the grade of his crime, which was applicable to a person entirely sober.'' Essentially the same thing was later repeated. The respondent excepted to the denial of his requests and also. to the charge as given.

Whatever may be held in other jurisdictions upon the subject it is the established rule in this State that voluntary intoxication does not excuse or palliate crime, or operate to reduce the degree of a homicide where the perpetrator was previously in the requisite condition of mental responsibility. ''Where the requisite proof is adduced to show a wicked intentional murder, he (the respondent) is not permitted to show a voluntary and temporary intoxication in extenuation of his crime.'' *State* v. *Tatro,* 50 Vt. 483, 490, 494; *State* v. *Hanlon,* 62 Vt. 334, 338, 19 Atl. 773. See, generally, Prof. Francis B. Sayre, ''Mens Rea,'' 45 Harv. Law Rec. 974, 1013, 1014. The charge as given correctly stated the law, and the respondent's exceptions are not sustained.

The court instructed the jury that the evidence tended to show that the respondent, when questioned by the investigating officers, falsified as to his whereabouts and movements on April 18, and that this evidence was proper to be considered as tending to show a consciousness of guilt on his part, although evidence of other motives for such sayings or conduct, indicative of or consistent with innocence should also be considered. An exception was taken to the failure of the court also to charge that such statements by respondent might be considered as bearing upon his mental condition.

There was no error in permitting the jury to consider the evidence of the respondent's falsehoods for the purpose indicated. *State* v. *Bradley, supra; State* v. *Harrison, supra.* During this part of the charge, the court was not dealing with the defense of insanity, but was speaking, as clearly appears from the context, upon the assumption that the respondent was sane. Any application of the evidence to the issue of insanity at this

point would have been out of place. Later on, the question of the respondent's mental condition was carefully considered, and the jury were told to take all the evidence into consideration in deciding this question. No exception was taken to this and no request for any further instruction was made. Assuming, but not deciding, that the evidence of the respondent's prevarications had a bearing upon the question whether, as he claimed, he had acted under an irresistible impulse, if he had committed the crime, we think that the matter was sufficiently covered by the charge, and there is no cause to complain.

The court also said, ''Now, in this case, if the respondent had the requisite mental stamina, nothing has been introduced in evidence that under any circumstances would justify his going from Barre to this farm and shooting his wife. There is nothing in the evidence that under any circumstances would justify such conduct, so as to under any possibility reduce the crime to manslaughter—I say, assuming that you find the respondent had the requisite control of himself, to which I will soon call your attention.'' An exception was taken to this statement. Assuming that this exception was properly saved, the error, if any, was harmless. By G. L. 6802, upon a trial for murder the jury may convict of manslaughter if, in its opinion, the evidence is sufficient to prove that offense, but is not sufficient to convict of murder. By the verdict of murder in the first degree, premeditation, deliberation, and malice aforethought were necessarily found to be present. Any one of these elements is inconsistent with the crime of manslaughter, and since they were all found to exist a verdict of guilty of manslaughter would not have been justified. Therefore the evidence, in the opinion of the jury, must have been sufficient to convict of murder. It was proper and logical for that body to consider first whether the charge of murder was sustained, and only if this question should be answered in the negative, to take up the issue of manslaughter. *State* v. *Long,* 95 Vt. 485, 496, 115 Atl. 734. Whatever fault there may have been in the charge was cured by the verdict. *State* v. *Long, supra,* 95 Vt. at page 495, 115 Atl. 734; *State* v. *Prouty,* 94 Vt. 359, 364, 111 Atl. 559; *Parizo* v. *Wilson,* 101 Vt. 514, 518, 144 Atl. 856.

After telling the jury that the statute made the respondent a competent witness at his request, in his own behalf,

the court went on to say: ''The credit to be given his testimony rests solely with you, and you are to consider it in view of his interest in the result of the trial, and give it the weight to which you think it is fairly entitled. It is obvious under the statute that if a respondent goes upon the stand, it is because he desires and intends that his evidence shall make in his favor, shall tend to shield him from the consequences of the charge that is made against him. This develops exactly the interest that he has. He has the utmost interest that a party can have. He has all the interest that can originate and be inspired by the peril in which he is and by the charge which is made against him when he is brought to trial; all the interest that a party can have in not being convicted of a crime with which he is charged. That is the position in which the person charged with crime stands when he goes upon the stand as a witness.'' An exception was taken in the following words: ''The respondent excepts to the court's charge that the respondent's evidence is taken as a shield to him; in other words that the evidence should be viewed in the light that his evidence is being used as a shield to protect him from the crime committed.'' The language thus made the subject of the exception was expressly approved in *State* v. *Daley*, 53 Vt. 442, 446, 38 A. R. 694. The statute (G. L. 2554) provides that the credit to be given to the testimony of a respondent is to be left solely to the jury, under the instructions of the court. It is obvious that when a respondent takes the stand, and gives evidence which, if believed, will tend to show his innocence, it must be because he desires and designs that it shall make in his favor, and protect or shield him from the consequences of the accusation, and the peril of conviction of the crime.

The argument, however, goes beyond the scope of the exception. It is urged that the charge denied the right of the respondent to be ''heard by himself'' when prosecuted for a criminal offense, under Article 10 of Chapter 1 of the Vermont Constitution; and his right to a trial by jury, under Article 12; that it deprived him of his liberty without legal justification, under Article 10, and the Fourteenth Amendment to the federal Constitution; that it rendered nugatory the presumption of innocence; and that it violated his right to defend himself under G. L. 2496, and to be a competent witness and have the credi-

bility of his testimony left solely to the jury under G. L. 2554.

None of these objections were made on trial, and even if meritorious they would not be for consideration when raised for the first time in this court. *Capital Garage Co.* v. *Powell,* 97 Vt. 204, 210, 122 Atl. 423; *Higgins, Admr.* v. *Metzger,* 101 Vt. 285, 296, 143 Atl. 394; *State* v. *Williams,* 94 Vt. 423, 443, 111 Atl. 701. However, the argument is ingenious rather than sound. The charge deprived the respondent of no constitutional safegard. He had the right to defend himself, and to be heard in his defense, and was a competent witness for that purpose. But he did not have the right to have the jury accept his testimony as true without reference to such considerations as would naturally affect its credibility. It was the duty of the court, under G. L. 2554, to call these matters to the jury's attention. By so doing, the respondent was not deprived of a jury trial, or of his liberty without due process of law, or of any presumption to which he was entitled. The exception is not sustained.

The respondent excepted to the failure of the court to instruct the jury that an irresistible impulse might exist for a moment or for a long time, and might have existed from the time of the arrest of the respondent on the charge of nonsupport until the day upon which Ruth Stacy was killed. No request had been made for such an instruction, and if we regard the exception as a request, it was out of time, and it was not error to refuse it. *Northern Trust Co.* v. *Perry,* 104 Vt. 44, 156 Atl. 906, 908; *Russ* v. *Good,* 90 Vt. 236, 241, 97 Atl. 987; *Clark* v. *Tudhope,* 89 Vt. 246, 250, 95 Atl. 489. However, the jury had been told that if the respondent was conscious of the nature of his act, and able to distinguish right from wrong, yet if his mind or will was involuntarily and completely destroyed so that he could not control his actions, that is, if his mind was governed by an uncontrollable and irresistible impulse produced and growing out of mental disease, and was unable to resist the impulse to shoot Ruth Stacy, then he was in a legal sense insane. This adequately covered the point, and amply protected the respondent's rights. While it was the duty of the court, without request, to charge upon all the substantial issues in the case, it was not required to make every conceivable comment upon the evidence and the weight of it. *State* v. *Fairbanks,* 101 Vt. 30, 40, 139 Atl. 918. This exception is not sustained.

The record in this case has been carefully examined, and all the questions raised have been considered. No reason appears for disturbing the result reached in the trial court.

*Judgment that there is no error, and that the respondent takes nothing by his exceptions. Let sentence pass and execution be done.*

### ON MOTION FOR REARGUMENT*

MOULTON, J. After the opinion in this case was handed down, counsel for respondent obtained leave to file a motion for reargument, and have done so, upon several grounds.

The first ground is based upon the statement in the opinion that certain objections to evidence were not made in the trial court and consequently are not available here. It is claimed, in substance, that these objections could not have been advanced at the time the evidence was received, but were included in a subsequent motion. However this may be, they were treated as being properly in the case, notwithstanding the fact that it did not appear that they had been stated, and were considered on their merits and held to be without force.

In support of the second ground it is urged that the testimony of the witness Bogardus to the effect that Remington Clean Bore cartridges were first put on the market in 1928 was struck from the records, and that therefore the Attorney General improperly made use of it in his argument to the jury. An examination of the transcript discloses that, while certain testimony of this witness was struck from the record, the ruling did not include what he had said concerning this matter.

It is not necessary particularly to notice the remaining grounds of the motion. All the questions raised by them were fully presented by the briefs and arguments of counsel, and received our careful attention. They were decided upon due consideration and we perceive no reason to recede from the conclusions reached in the opinion. No reason for granting a reargument of the case is made to appear. *Goodwin, Admx.* v. *Gaston et al., Rec'rs,* 103 Vt. 357, 370, 154 Atl. 772; *McAllister* v. *Benjamin,* 96 Vt. 475, 500, 121 Atl. 263; *Ryan* v. *Orient Ins. Co.,* 96 Vt. 291, 305, 119 Atl. 423.

*Motion for reargument denied.*

*Opinion on motion for reargument filed May 26, 1932.