Commonwealth *v.* Sacarakis et al., Appellants.

456

Argued September 11, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

Before PALMER, J.

*Justin D. Jirolanio,* for appellants.

*Bernard V. O'Hare, Jr.,* First Assistant District Attorney, with him *Andrew L. Herster,* District Attorney, for Commonwealth, appellee.

OPINION BY FLOOD, J., November 16, 1961:

The defendant Anthony Sacarakis appeals from his conviction of carrying a firearm without a license, wantonly and playfully pointing a firearm, and forcible entry. The defendants David Sacarakis and Samuel Hughes at the same time appeal from their conviction of forcible entry.

1. The defendants object that their convictions were against the weight of the evidence. We do not agree that this position is well taken.

On the evening of August 20, 1960, George Peters met Anthony Sacarakis, a Councilman of the City of Bethlehem, at the Travelers' Diner in that city. Peters told Sacarakis he wanted to "have a couple of drinks" and "see the town". Sacarakis referred him to defendant Samuel Hughes who was inside the diner. Hughes and Peters then went to a bar, where they were approached by a girl referred to in the testimony only as

"Frances". Arrangements were then made by Hughes for Peters to have sexual relations with Frances. Peters apparently paid in advance and it was testified by Hughes that Frances gave part of the money to Mary Carter for the use of her third floor apartment at 239 Diamond Street in the City of Bethlehem. Hughes, Peters and Frances then went to this apartment. Frances stole Peters' trousers and wallet and ran out of the apartment. Thereafter Peters and Hughes, while looking through the neighborhood for the girl, were apprehended by the police and taken to police headquarters.

Anthony Sacarakis, whose mother resides on Diamond Street across from the Mary Carter residence, went to Diamond Street apparently looking for Hughes and Peters. According to various Commonwealth witnesses, when he arrived there, he drew a pistol from his pocket and fired it.

Lafayette W. Hall testified that he heard Sacarakis say, "Now I'm here, and you will know I am here", and then heard a shot and saw a pistol in the hand of Sacarakis. Hall also testified that he saw Sacarakis then enter his automobile, open the window and shake the gun out of the window, saying "I will be back, you just wait, I will be right back." He and his wife then drove off.

Matthew Harrison testified that he observed Anthony Sacarakis walking up Diamond Street toward Columbia Alley and that as Anthony passed in front of him he took a pistol from his pocket. Shortly thereafter Harrison heard a sound somewhat like a shot. He observed Sacarakis replace the pistol in his pocket as he came back.

David J. Young, Mary Carter's sixteen year old nephew, testified that he saw a pistol in the hand of Anthony Sacarakis, that he saw him fire it, that the bullet struck within one foot of the witness' foot, and

thereafter Young heard Anthony Sacarakis say, "Now you know I'm here." This witness corroborated Hall's testimony to the effect that when Sacarakis got back into his car he waved the pistol out the window.

Anthony Sacarakis and his wife drove away but returned later with Hughes, Peters and David Sacarakis. The four men then went to the rear of Mary Carter's residence. Hall said he saw them knock at Mary Carter's first floor door, then go up toward the third floor, and then, ten or fifteen minutes later, come down and knock on the first floor door again.

Mary Carter testified she heard a pounding and banging on the back door of her apartment. Upon getting out of bed and inquiring who was there, a male voice replied, "Open up the door in the name of the law; if you don't, I'll break it down . . . What I have in my hand is the law." She then turned the night latch and "the door came open with the force, and in come Mr. Sacarakis with a gun in his hand pointing to my chest." Hughes, Peters and David Sacarakis came in behind Anthony. Mary Carter testified that Anthony Sacarakis kept pointing the pistol at her chest and said to her, "Mary Carter, give me back my uncle's pants, wallet, and the money that belongs to him." She was afraid and backed into another room with Anthony Sacarakis following her still pointing the gun at her chest. Upon the arrival of the police, Anthony Sacarakis put the pistol into his pocket.

It was stipulated that Anthony Sacarakis had no license to carry a gun.

Anthony Sacarakis, his wife, Hughes and David Sacarakis each took the stand and, while admitting they were in the area at the time indicated by the Commonwealth's testimony, categorically denied that Anthony had a gun and that the defendants forcibly entered Mary Carter's apartment. They testified that Mary Carter had freely admitted them.

This recital of the testimony is sufficient to show that there was a conflict of testimony for the jury and that there is no basis for reversing the jury's resolution of various questions of credibility against the defendants.

As to the charge of carrying a firearm without a license there is ample evidence from several witnesses, as set forth above, to sustain the conviction.

As to the charge that Anthony Sacarakis had unlawfully and wantonly pointed the firearm at Mary Carter and the charge of forcible entry the only direct evidence is that of Mary Carter. However, the evidence as to the circumstances and as to what had happened prior thereto may well have been considered by the jury as important in this connection. The matter is chiefly one of credibility.

As to the charge of wantonly pointing the firearm Mary Carter said that the gun was pointed at her by Anthony and that he pointed it with language indicating its possible use if she did not hand over the articles he demanded. Although he and his co-defendants denied this, this is purely a matter for the jury. The defendants are interested witnesses and the jury need not believe any of them against Mary Carter. We cannot say that this verdict was against the weight of the evidence.

The evidence of Mary Carter is also sufficient to establish the charge of forcible entry, as against the testimony of the defendants, if the jury believes her testimony. The defendant Anthony argues that he used no force or threat of force to enter the property. Under Mary Carter's testimony, it appears that he ordered her to open the door in the name of the law saying that he would break it down if she refused. She also testified that Anthony said: "What I have in my hand is the law." The jury could infer that this was an entry by threat of force, even of deadly force. She

unlatched the door but she did not open it. He then pushed his way in. It needs little argument to show that this is a forcible entry and that his action in claiming to be an officer of the law and carrying a gun might well have overawed her.

David and Samuel Hughes claim that they did not personally use any force or make any threats. While this is true, yet according to Mary Carter's testimony they accompanied Anthony to the premises and entered immediately behind him, taking advantage of Anthony's threat while Anthony was pointing the gun at her chest. If this is so, they aided and abetted him and are as guilty of this crime as is Anthony. Act of June 24, 1939, P. L. 872, §1105, as amended, 18 P.S. §5105.

2. The defendants argue that the court committed reversible error in allowing the district attorney in his summation to comment on their failure to call as a witness the co-defendant George Peters who resides in New York and who was not extradited by the district attorney or present at the trial. The court was in error on this point because the absent witness was a co-defendant who could have refused to testify and his refusal would not have justified the jury in drawing any adverse inference against him or against any other defendant. See *Commonwealth v. Black,* 186 Pa. Superior Ct. 160, 142 A. 2d 495 (1958). However, the error was corrected by the court's charge in which the jury was told that the failure to produce such a co-defendant does not raise any inference that if he were present the testimony would have been adverse to the other defendants.

The defendant argues that the correction did not cure the error because the court said only that it believed that its earlier ruling was in error and did not think that it is the duty of a defendant to produce a co-defendant in a criminal case. However, the trial judge thereafter flatly instructed the jury that the fail-

ure to produce the defendant does not raise any inference that his testimony would have been adverse to the other defendants. This cures the error in the ruling.

3. The defendant Anthony Sacarakis objects that one of the police officers was permitted to testify that David Sacarakis said he heard the gun go off. The court then instructed the jury that this testimony should not be taken against Anthony Sacarakis, who alone was charged with carrying or pointing the gun, and that the testimony was received solely for the purpose of impeaching the credibility of the witness. Anthony Sacarakis argues that this was not adequate because the court on two prior occasions had instructed the jury that offered testimony was hearsay as to certain defendants prior to receiving it. No authority has been cited to justify the position that this instruction must precede the admission of the testimony, and we know of none. The court's instruction that it should not be received as against Anthony was sufficient to prevent any prejudicial error as to him. See *Commonwealth v. Deitrick,* 221 Pa. 7, 70 A. 275 (1908).

4. The defendants stress most strongly the objection that the trial court erred in denying its petition for a change of venue. The court held that it had no power to grant a change of venue in the case of a misdemeanor.

The Constitution in Article III, §23, provides that the power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law. This provision does not take away the Supreme Court's inherent power to grant a change of venue but merely gives the legislature the right, by statute, to confer power upon the trial courts to change venue in the cases enumerated by such statute. *Apex Hosiery Co. v. Philadelphia County,* 331 Pa. 177, 200 A. 598 (1938). The only statute that covers this matter with regard to criminal

cases is the Act of March 18, 1875, P. L. 30, §1, 19 P.S. §551, which provides for a change of venue in four cases set forth in four paragraphs: (1) where a judge is disqualified because of relationship to a party or knowledge of the facts; (2) in the case of felonies in certain detailed situations; (3) after an unsuccessful effort to impanel a jury, upon affidavit making it appear that a fair trial cannot be had; and (4) on the second trial of any felonious homicide, where certain circumstances exist. The first is not apposite here, and of the others, it is easily seen that only the third would possibly give the trial judge the right to change venue in the case of a misdemeanor. This paragraph reads as follows: "When, upon the trial of any criminal case, an unsuccessful effort has been made to procure and impanel a jury for the trial of a defendant, and it shall be made to appear to the court by a written affidavit of some credible witness that a fair trial cannot be had."

Here, the effort to procure and impanel a jury was successful. There was no indication that the defendant did not exercise fully his right to question jurors upon voir dire as to any relevant matter. Again there was no written affidavit by any witness that a fair trial could not be had. There was merely such a statement by the defense attorney and his production of certain exhibits from newspapers. Since then the requisites of paragraph third were not present as there had been no unsuccessful effort to procure and impanel a jury and no affidavit that a fair trial could not be had, the trial court had no power to grant a change of venue.

The defendant argues that his constitutional right to a jury trial guaranteed to him under Article I, §6 of the Constitution and to a trial by an impartial jury of the vicinage under Article I, §9 are violated if he is not granted a change of venue because of certain newspaper articles. Without considering whether the facts

in evidence justify such a position in this case, the only method by which he can assert any such right is by application to the Supreme Court which has the power to grant a change of venue under its King's Bench power irrespective of statute. *Commonwealth v. Ronemus*, 205 Pa. 420, 54 A. 1095 (1903). He cannot assert it in the trial court in the absence of a statute giving that court the authority to change venue in this situation since the trial court has no inherent power to grant a change of venue. *Apex Hosiery Co. v. Philadelphia County*, supra.

Judgments affirmed.