411 A.2d 1203

**PENNSYLVANIA POWER & LIGHT COMPANY,**

v.

**GULF OIL CORPORATION, Scallop Nuclear Inc. and General Atomic Company, Appellants.**

Superior Court of Pennsylvania.

Argued March 23, 1979.

Filed Sept. 28, 1979.

Petition for Allowance of Appeal Denied Jan. 14, 1980.

518

·Gordon W. Gerber, Philadelphia, for appellants.

K. Robert Conrad, Philadelphia, for appellee.

Before CERCONE, President Judge, and PRICE, VAN der VOORT, SPAETH, HESTER and WIEAND, JJ.

SPAETH, Judge:

On November 6, 1974, Pennsylvania Power & Light Company (PP&L) started the present action in assumpsit against General Atomic Company (GAC) and GAC's partners, Gulf Oil Corporation and Scallop Nuclear, Inc. The complaint was filed in Lehigh County and alleged that in the fall of 1973, PP&L had entered into a contract with Gulf United Nuclear Fuel Corporation, a predecessor of GAC, for the delivery of uranium and fuel fabrication devices, and for various services, to PP&L's nuclear power plants, and that in 1974 GAC had repudiated this contract, causing damages in

excess of $10,000. PP&L requested a trial by jury. GAC filed an answer to the complaint, in which it denied the existence of any contract, raised other defenses, and pleaded various counterclaims. GAC also filed an application for change of venue, alleging, *inter alia*,[1] that it could not obtain a fair trial because a large number of the inhabitants of Lehigh county were customers of PP&L and therefore had an interest in the case adverse to GAC. On March 30, 1976, the lower court denied this application. PP&L subsequently answered interrogatories propounded by GAC, in which it estimated its damages to be from $88,642,525.60 to $114,471,031.60 or more.[2] On December 15, 1977, GAC petitioned the lower court to reconsider its order of March 30, 1976, denying GAC's application for change of venue.[3] On January 4, 1978, PP&L filed an answer to GAC's petition for reconsideration,[4] and after depositions[5] and oral argument, the

1. In its application GAC also alleged that it could not obtain a fair trial in Lehigh County because of "substantial pre-trial publicity." In support of this allegation GAC attached to its application several reports that had appeared in local newspapers in November 1974, when PP&L started the present action.

2. At the time it answered GAC's interrogatories PP&L reserved the right to amend its answer to interrogatory number 47, which concerned the amount of damages. PP&L has since amended its answer to claim damages of $229,288,406 to $274,493,522 or more.

3. GAC did not allege "substantial pre-trial publicity" as a ground for reconsideration, *see* note 1 *supra*, and it has not argued on this appeal that its petition for reconsideration should have been granted because of such publicity.

4. PP&L states that the matter was essentially ready for trial by the end of 1978 and has accused GAC of attempting to delay the trial. In support of its accusation of attempt to delay PP&L points to the fact that GAC did not petition the lower court to reconsider its order of March 30, 1976, until December 15, 1977. GAC excuses the delay in filing the petition for reconsideration on the ground that PP&L did not disclose the amount of damages it was seeking until November 30, 1976; before that time, GAC says it did not have a complete factual record upon which to make its argument with respect to the issue of jury prejudice. GAC further excuses the delay on the ground that both it and PP&L had filed motions for summary judgment, the granting of either of which would have rendered an

lower court, by order of June 21, 1978, denied the petition for reconsideration. On October 4, 1978, at GAC's request, the lower court certified its order of June 21 for interlocutory appeal,[6] and on December 27, 1978, this court permitted the appeal.[7]

In support of its argument that it cannot obtain a fair trial in Lehigh County, GAC cites the deposition testimony

application for change of venue superfluous. After the lower court had denied the motions for summary judgment, on September 19, 1977, according to GAC the venue issue was no longer superfluous and it therefore filed the petition for reconsideration. GAC also asserts that PP&L's statement that the matter was essentially ready for trial by the end of 1978 is belied by the fact that on March 15, 1979, PP&L amended its damage claim upward to $229,288,406 to $274,493,522 or more.

5. The depositions were taken pursuant to Pa.R.C.P., No. 209.

6. The order of the lower court was as follows:

AND NOW, this 4th day of October, 1978, after consideration on briefs of the parties hereto of [GAC's] petition for amendment of the interlocutory court order entered June 21, 1978 denying [its] motion for change of venue and transfer, it appearing that the damages involved in the case are allegedly substantial; that trial is expected to be lengthy and commensurate with such alleged damages, and that it would be a miscarriage of justice to incur the time and expense of trial only to have the judgment of this court reversed for error in determining this initial motion to transfer; that this court is of the opinion and specifically finds that its decision to deny the motion for transfer involves a controlling question to which there is a substantial ground for difference of opinion; that an immediate appeal from the order may materially advance the ultimate determination of the litigation, and based upon this finding,

IT IS ORDERED that [GAC] may seek an immediate appeal as provided by Section 702(b) of the Judiciary Act of 1976, 42 Pa.C. S.A. § 702(b).

R. at 874a–75a.

7. Jurisdiction of this court is pursuant to the Act of July 9, 1976, P.L. 586, No. 142, as amended by Act of April 28, 1978, No. 53, 42 Pa.C.S. § 702(b), which provides:

"When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

42 Pa.C.S. § 702(b). See also Pa.R.A.P., Rules 312, 1311.

of George Vanderslice, PP&L's Vice President and Comptroller, and William O'Hara, a former Commissioner of the Pennsylvania Public Utility Commission (PUC). Both men testified that the PUC would have to rule on how a recovery of damages as large as the one sought by PP&L should be treated. They testified that they did not know how the PUC would in fact rule. Mr. Vanderslice testified, however, that it was doubtful that the PUC would permit PP&L to distribute any of the damages to its shareholders, and he admitted that the tendency of any PUC ruling would be to reduce the electric bills to PP&L's customers. Mr. O'Hara also testified that the damages would not go to the shareholders. He suggested three different ways in which the PUC might rule: either (1) reduce the rate base of PP&L's Susquehanna nuclear plant; or (2) allow a reimbursement under the fuel adjustment clause; or (3) permit PP&L to retain the damages recovered for additional capital investments. All of these possible rulings would result in lower electric bills to PP&L customers, but this benefit, according to Mr. O'Hara, could be spread over a period of several years.[8] Based upon this testimony, and using population and

**8.** Mr. O'Hara described the effect of the three different rulings by hypothesizing a recovery of $100 million and a Susquehanna plant base of $1 billion. If the recovery were used to reduce the rate base of the plant, Mr. O'Hara calculated that the base would be reduced to $900 million, which at 7% would result in a benefit of $6.3 million in the first year. (Since there are just under 1 million households served by PP&L, the benefit to each in the first year would be approximately $7.) Assuming that inflation would raise the replacement costs of the plant, Mr. O'Hara said that the benefit would increase from year to year. If a reimbursement under the fuel adjustment clause were permitted, according to Mr. O'Hara, the recovery would be taken as a reduction until the entire recovery was exhausted. If the recovery was used to finance additional capital investments, PP&L would have $100 million it might otherwise have to borrow. Assuming an interest rate of 11%, Mr. O'Hara stated that the benefit obtained by this use of the money would be $11 million. R. at 662a–73a. While Mr. O'Hara testified that if a fuel reimbursement were allowed the immediate benefit to a PP&L household would be greater, he also testified that PP&L and the PUC would most likely choose to use any recovery to reduce the rate base of the Susquehanna plant. This use, as Mr. O'Hara described it, and as GAC admits, would result in the distribution of the benefit of any recovery over a longer period. *See* Appellant's Brief at p. 12 n. 13.

PP&L customer figures, GAC calculates that 98.5% of the residents of Lehigh County are customers of PP&L, and that each could receive a benefit of as much as $289.86.[9]

Citing the deposition testimony of Dr. Burton Cohen, a witness expert in psychiatry, GAC argues that the possibility of such a benefit would color the jurors' perception of the evidence and prejudice them against GAC.[10]

PP&L disputes GAC's argument on several grounds. It disagrees with GAC's calculation that 98.5% of the residents of Lehigh County are customers of PP&L. PP&L argues instead that only 44.9% of the residents are its customers. PP&L also argues that the possibility of any customer receiving any benefit is speculative, as no one can foresee the future actions of the PUC, and that even if the PUC were to rule in such a way that any recovery would benefit

**9.** GAC calculated that an award of $88,642,525.60 to $114,471,031.60 would result in a benefit of $93.60 to $120.88 to each PP&L household. PP&L denied that any benefit would occur, but asserted that if one were to occur, it would be $43.43 to $56.09. Based upon PP&L's new damage claims, *see* note 2 *supra,* GAC now calculates the benefit to be $242.12 to $289.86.

**10.** Dr. Cohen was questioned as follows:

Q. In your professional opinion, assuming that an average person sitting on a Lehigh County jury believes, either consciously or subconsciously, that he may benefit by between $43 and $120 from a verdict for PP&L, is it probable that such a belief would bias the juror in PP&L's favor?

A. I believe it would.

Q. Okay. I'll ask you another question. In your professional opinion, assuming that a juror is biased either consciously or subconsciously in favor of PP&L, is it probable that such a bias would color the juror's perception, interpretation and analysis of the evidence presented to him in the course of a trial?

A. Again I believe that there would be a bias existing under those circumstances as well.

* * * * * *

Q. In your professional opinion, Professor Cohen, assuming that a juror is biased, either consciously or subconsciously, in favor of PP&L, is it probable that such a bias would color the juror's perception, under standing and application of rules of law presented to him by the Court in the course of a trial?

A. I would suspect it's entirely possible.

R. at 722a–24a.

the customers and not the shareholders of PP&L, the immediate impact upon any individual juror would be negligible, as any such benefit would likely be spread over a period of several years. PP&L also argues that the jury could not be prejudiced against GAC and in favor of PP&L as there is no evidence that the people of Lehigh County believe [11] that a recovery for PP&L would represent a benefit to PP&L's customers.[12]

11. PP&L also argues that Professor Cohen's testimony was inadmissible and incompetent because it was based on an assumption, not in evidence, that the jurors would know or believe that they could benefit from a recovery by PP&L. Since this objection was not made below we shall not consider its validity but will treat the professor's testimony as admissible.

12. PP&L also argues that acceptance of GAC's argument would amount to holding that every potential juror in the entire Commonwealth would have a disqualifying interest in the case because of PP&L's membership in the Pennsylvania—New Jersey—Maryland Interconnection (PJM) and the purchase by the Allegheny Electric Cooperative (Allegheny Coop) of a 10% interest in the output of PP&L's Susquehanna nuclear plant.

The PJM is an organization of eleven electric utilities that sell electric power to one another. The PJM has members in and covers most of Pennsylvania and Maryland, all of New Jersey, Delaware and the District of Columbia, and a portion of Virginia. A member utility, in time of need, may buy electric power from another member utility. Thus electric power produced by PP&L's Susquehanna plant could be used by another utility in the PJM. The Allegheny Coop is an association of some fourteen rural electric cooperatives with customers in many of the counties of the Commonwealth.

PP&L argues that if a recovery by it in this action were used to reduce the rate base of the Susquehanna nuclear plant, as predicted by Mr. O'Hara, then all of the customers of members of the PJM and all of the customers of members of the Allegheny Coop would benefit. PJM members would benefit because rate charges for power supplied from one member utility to another are based upon operating costs including fuel charges. Allegheny Coop members would benefit because of their 10% ownership of the plant and the reduced rate base.

GAC disputes PP&L's explanation of the rate charging system of the PJM. GAC also asserts that even if any benefit would flow to a customer of a PJM or Allegheny Coop member utility, this benefit would be much less substantial than the benefit received by a direct customer of PP&L, and further, that the customer of the PJM or Allegheny Coop member utility would not receive his electric bill from PP&L but from his own utility and thus would not identify his interest with PP&L's interest as readily as would a direct customer of PP&L.

The issue may be framed in two arguments: (1) that Pennsylvania law entitles GAC to a change of venue; [13] and (2) that by forcing it to stand trial before a Lehigh County jury, the lower court has violated GAC's right to due process of law as guaranteed by the fourteenth amendment of the United States Constitution.

1

The Pennsylvania Constitution provides that "[t]he power to change venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law." Pa.Const. art. 3, § 23. This provision did not affect the Supreme Court's inherent power to grant a change of venue, but gave the legislature the right, by statute, to confer such power upon the trial courts. *Apex Hosiery Co. v. Philadelphia County*, 331 Pa. 177, 200 A. 598 (1938); *Commonwealth v. Sacarakis*, 196 Pa.Super. 455, 175 A.2d 127 (1961).[14] The statute by which the legislature conferred such power in a civil case [15] is the Act of March 30, 1875, P.L. 35, §§ 1–3, *as amended,* Act of March 18, 1909,

**13.** GAC does not request that venue be transferred to a county where no veniremen are customers of PP&L but only to some county where less than a majority of the residents receive electricity directly from PP&L. According to a table included in the appendix to GAC's Reply Brief, there are several counties in the eastern part of the state, including Delaware, Montgomery, and Philadelphia, where less than 50% of the residents receive their electricity from PP&L.

**14.** The Supreme Court's inherent power to grant a change of venue is based on the Act of May 22, 1722, which provided the Court with the powers of the English Court of King's Bench. *See Apex Hosiery Co. v. Philadelphia County, supra.* The inferior county courts had no such inherent power. *Apex Hosiery Co. v. Philadelphia County, supra,* 331 Pa. at 178, 200 A. at 598; *Wattson v. Chester & Delaware R.R. Co.,* 83 Pa. 254, 256–57 (1877); *Commonwealth v. Sacarakis, supra,* 196 Pa.Super. at 462, 175 A.2d at 130; *see Lee v. Lehigh County,* 35 Leh.L.J. 310 (1973); *Schelhaus v. Pennsylvania Truck Lines, Inc.,* 109 P.L.J. 300 (1962).

**15.** There is also a statute for criminal cases. *See* Act of March 18, 1875, P.L. 30 § 1, 19 P.S. § 551. *See also Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978) (due process right to fair trial); *Commonwealth v. Rolison,* 473 Pa. 261, 374 A.2d 509 (1977) (plurality opinion) (due process).

P.L. 37, § 1, 12 P.S. §§ 111–113 (1953).[16] Pertinent to GAC's application for a change of venue in this case is the fifth subsection of section 1 and subsections I and III of section 3 of the Act. The fifth subsection of section 1 provides:

Changes of venue shall be made in any civil cause, in law or in equity, depending in any of the courts of this Commonwealth, in the cases following; namely—

* * * * * *

Fifth. Whenever a large number of the inhabitants of the county, in which cause is pending, have an interest in the question involved therein, adverse to the applicant, and it shall appear to the court that he cannot have a fair and impartial trial.

12 P.S. § 111.

**16.** Effective June 27, 1980, the Act of March 30, 1875, will be repealed, *see* Judiciary Repealer Act, Act of April 28, 1978, P.L. 202, No. 53, 42 Pa.C.S. §§ 20002(a) [657], 20004(b), and replaced by section 5106 of the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, 42 Pa.C.S. § 5106, which provides that "[t]he power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided or prescribed by law."

While resolution of the present case is controlled by the Act of 1875, 12 P.S. §§ 111–113, a problem may be foreseen with respect to section 5106 of the Judicial Code. This section is very similar to section 23 of article 3 of the Constitution in that it merely provides that venue may be changed as provided by law. In *Wattson v. Chester & Delaware R.R. Co., supra* at 256–57, the Supreme Court indicated that the trial court could not grant a change of venue under section 23 of article 3 of the Constitution absent specific statutory authorization. *See also Commonwealth v. Sacarakis, supra* at 464, 175 A. at 131 (trial court has no inherent power to grant a change of venue and cannot act in absence of statute). If the power of the trial courts to grant a change of venue is a creature of statute, *see Little v. Wyoming County*, 214 Pa. 596, 63 A. 1039 (1906) (manner in which power to grant change of venue may be exercised is entirely under legislative control), then, upon the repeal of the Act of 1875 and its replacement with section 5106 of the Judicial Code, a party in a future case who wishes to challenge a trial court's order granting a change of venue may argue that the court had no power to enter the order because no legislative act—no "law"—had been enacted providing the court with such power.

Subsections I and III of section 3 provide:

Changes of venue may be made in any civil cause in law or equity depending in any of the courts of this commonwealth in cases following, to wit:

I. Whenever it shall appear to the satisfaction of the court in which such cause is depending, that any party to such cause hath an undue influence over the minds of the inhabitants of the said county, or that they are prejudiced against the applicant, so that a fair and impartial trial cannot be had.

\* \* \* \* \* \*

III. Whenever it shall be made to appear to the court that a fair and impartial trial cannot be had in the county in which any such cause is depending.

Applications for change of venue under the provisions of this section shall be made to the court in term time in the manner provided in the second section of this act, and notice of the same having been given to the opposite party or his attorney, the court shall proceed to hear the parties by counsel, and affidavits if necessary, and may refuse or award such change of venue, as in its discretion it shall see fit.

12 P.S. § 113.

A change of venue under the fifth subsection of section 1 is mandatory. *Everson v. Sun Co.*, 215 Pa. 231, 64 A. 365 (1906); *Little v. Wyoming County*, 214 Pa. 596, 63 A. 1039 (1906); *Willoughby v. Buffalo, Rochester & Pittsburg Ry. Co.*, 203 Pa. 243, 52 A. 188 (1902). If the lower court "is satisfied of the truth of the facts alleged" in the application, 12 P.S. § 112, the change of venue *"shall* be made . . . [if] it shall appear to the court that the applicant cannot have a fair and impartial trial." 12 P.S. § 111 (emphasis added). *See Everson v. Sun Co., supra; Willoughby v. Buffalo, Rochester & Pittsburg Ry. Co., supra; Manu-mine Research and Development Co. v. Pennsylvania Turnpike Commission,* 79 Dauph. 341 (1964); *Durham Terrace, Inc. v.*

*WKAP, Inc.*, 26 Leh.L.J. 452 (1956).[17] A change of venue under section 3 is not mandatory, however, as the lower court "may refuse or award such change of venue, *as in its discretion* it shall see fit." 12 P.S. § 113 (emphasis added). *See Little v. Wyoming County, supra; Willoughby v. Buffalo, Rochester & Pittsburg Ry. Co., supra.* Thus, while the facts alleged in support of GAC's application raise arguments under both sections 1 and 3, the crucial question is whether GAC has proved that venue should be changed under section 1, for if it has, the lower court had no choice but to grant the application.

■■■■ A change of venue "is not granted lightly or without real necessity," *Pennsylvania R.R. Co. v. City of Reading*, 254 Pa. 110, 117, 98 A. 791, 793 (1916) (opinion of lower court affirmed *per curiam* ); *see Slushy v. Reliance Ins. Co.*, 74 D. & C.2d 624, 65 Luz.L.Reg. 71 (1974), and the applicant bears the burden of proving that the change of venue is necessary. *Burns v. Pennsylvania R.R. Co.*, 222 Pa. 406, 408, 71 A. 1054, 1055 (1909); *Willoughby v. Buffalo, Rochester & Pittsburg Ry. Co., supra* 203 Pa. at 248, 52 A. at 189. Therefore, in order to have an application for change of venue under the fifth subsection of section 1 granted, the applicant must prove and the court must find that "a large number of the inhabitants of the county . . . have an interest . . . adverse to the applicant, and . . .

---

**17.** Before it was amended in 1909, the fifth subsection of section 1 of the act of 1875 provided that venue shall be changed "whenever a large number of the inhabitants of the county in which such cause is pending, have an interest in the question involved therein, adverse to the applicant, *and it shall appear, by the oath of such applicant, that he believes he cannot have a fair and impartial trial* " (emphasis added). Under this earlier version of section 1 it was not "the duty of the court to determine whether the applicant could have a fair and impartial trial in the county where the cause was pending. . . . [All that was required was] . . . that it shall appear by the oath of the applicant that he believes he cannot have a fair trial." *Willoughby v. Buffalo, Rochester & Pittsburg Rwy. Co., supra* 203 Pa. at 247–48, 52 A. at 189. *See Little v. Wyoming County, supra.* Under the Act as amended it is the duty of the lower court to make such a determination; a mere oath by the applicant is no longer sufficient but it must "appear to the court that he cannot have a fair and impartial trial." 12 P.S. § 111.

that [the applicant] cannot have a fair and impartial trial." *See Eyre v. Berry*, 260 Pa. 518, 520, 103 A. 920 (1918); *see also Brittain v. Monroe County*, 214 Pa. 648, 63 A. 1076 (1906); *Willoughby v. Buffalo, Rochester & Pittsburg Ry. Co., supra* 203 Pa. at 188, 52 A. at 246 (discussing proof necessary under the Act before the 1909 amendments). In reviewing the application, the lower court is not "compelled to accept as conclusive the [application and] affidavits . . [alone] but may direct testimony be taken to enable it to ascertain the facts" and to make the required findings. *Brittain v. Monroe County, supra* 214 Pa. at 650, 63 A. at 1077. Where the facts as found by the lower court are supported by the record, the decision of the lower court shall be respected on appeal. *Everson v. Sun Co., supra.*[18]

█ The number of inhabitants with an interest adverse to the applicant is significant in determining whether venue should be changed because if only a small percentage of the people of a county can be said to have an adverse interest, the applicant may still obtain an impartial jury by using his challenges to eliminate the interested members of the panel of veniremen. By requiring that the adverse interest be held by "a large number of the inhabitants," the legislature

**18.** In denying GAC's original application for a change of venue the lower court entered the following order and memorandum opinion:

AND NOW, this 30 day of March, 1976, after argument and a thorough review of the respective briefs, the defendants' petition for a stay of the within proceeding is denied and in view of *Pennsylvania Railroad Company vs[v]. City of Reading*, 254 Pa. 110, 117, 98 A. 791 (1916); *Manu-Mine Research and Development Co. vs[v]. Pennsylvania Turnpike Commission*, 79 Dauphin 341, 345 (1962); as well as *Virginia Electric and Power vs[v]. Sun Shipbuilding and Dry Dock Co.*, 389 F.Supp. 568 (E.D.Va.1975); the motion for change of venue is denied.

The lower court has not filed an opinion pursuant to Rule 1925 of the Pennsylvania Rules of Appellate Procedure, but has instead referred us to the above-quoted order and memorandum opinion as adequately setting forth the grounds for its denial of the application for change of venue and for its denial of the petition for reconsideration. We should have preferred a fuller explanation, in particular, findings of fact would have been helpful. However, in the interest of judicial economy, and because of our concern that there be no more delay in the trial of this case, we shall not remand but shall decide the case on the present record.

made plain that venue should be changed only in a case where the percentage of adversely interested inhabitants is so great that even by using his challenges, the applicant will be unable to obtain an impartial jury. Thus in *Everson v. Sun Co., supra,* the Supreme Court, in affirming the lower court's denial of an application for a change of venue, stated:

The purpose of the act of 1875 must be kept in view in ascertaining what constitutes in contemplation of the statute a large number of the inhabitants of a county. The legislative intent was to secure to the litigant a jury which would afford him an opportunity to have a fair and impartial trial; and when that cannot be obtained in the county in which the action is pending by reason of the number of the inhabitants throughout the county having an interest adverse to him in the question involved, then there is in contemplation of the act "a large number of the inhabitants" having an adverse interest, which requires the court to change the venue. The fact which authorizes a change of venue under paragraph five of section one of the act is that "a large number of the inhabitants of the county," and not of a particular locality in the county, is interested in the controverted question in the cause. The question involved in the present suit arises out of an alleged cause of action which, if it exists at all, exists only in one locality in Delaware county, and affects only those who reside or have property interests in that particular locality. A jury is drawn from the body of the whole county, and where, as here, the persons interested in the question involved in the cause at issue are confined to a particular locality and the number is relatively very small in comparison with the population of the whole county, there is no sufficient ground to send the cause to another county for trial. By exercising their right to challenge, the parties can secure a jury which will not be prejudiced on account of the number of people who are interested in the result of the cause. The number of people interested in a pending action may be a large proportion of the population of the community in which the cause of action

arose, but it may be a very small proportion of the whole county. It is apparent, we think, that taking into consideration the population of Delaware county and the number of inhabitants in the community who are alleged to be affected by defendant's works, a jury can be obtained from the panel, taken from the whole county, which will have no interest in the cause and which will be strictly impartial.

215 Pa. at 233–34, 64 A. at 365–366. *See Presbyterian Church v. Philadelphia, Bristol & Trenton Street Ry. Co.*, 217 Pa. 399, 400, 66 A. 652 (1907) (lower court did not err in denying application for change of venue where interest in case was confined to portion of borough and population of borough was less than one-tenth of population of county).

■ Proof that 98.5% of the possible veniremen in Lehigh County have an interest adverse to GAC would certainly satisfy the "large number of inhabitants" requirement, as in that case only 3 out of every 200 veniremen would be unchallenged. PP&L argues, however, that only 44.9% of the possible veniremen of Lehigh County are its customers, and that very few, if any, of that number would have an interest adverse to GAC.

GAC's 98.5% figure is apparently based upon a calculation using the number of PP&L customers as compared to the number of households in Lehigh County and the population of the households. PP&L's 44.9% figure is apparently based upon a calculation of customers in which the definition of "customer" is limited to each meter or billing name and does not include the other members of the billed customer's household.[19] Thus GAC defines "customer" broadly, as anyone who receives the benefit of electricity supplied by PP&L, while PP&L defines "customer" narrowly, as anyone

19. PP&L argues that GAC's 98.5% figure is not limited to residential consumers of electricity but also includes industrial and commercial users. Based upon an estimation that 88% of its customers are residential customers, PP&L calculates that it had 88,900 residential customers in Lehigh County as of November 30, 1977, which is 44.9% of the entire population of Lehigh County over eighteen years of age.

who is billed for electricity. In the context of determining the number of inhabitants who have an interest adverse to GAC, however, neither figure is very helpful. GAC's 98.5% figure seems too broad as it would apparently include tenants in a multi-family single meter house where the landlord pays the bill sent by PP&L. These tenants do not pay PP&L, but pay for electricity as part of their rent. Thus they would receive no benefit if their landlord's future electric bills were reduced.[20] PP&L's 44.9% figure seems too limited as it would apparently exclude the spouse and other related members of the billed customer's household, although these persons might benefit if the billed customer's electric bills were reduced.

The lower court made no finding as to which figure was correct. *See Presbyterian Church v. Philadelphia, Bristol & Trenton Street Ry. Co., supra* (number of inhabitants is question of fact to be resolved by trial judge). Such a finding would probably be impossible without an examination of data concerning types of housing, and we cannot make it. Its absence, however, is not crucial, for our concern is not to determine the number of veniremen who are PP&L customers, however "customer" may be defined, but the number of veniremen who have an interest adverse to GAC. The fact that a person is a customer of PP&L does not by itself mean that he has an interest adverse to GAC. *Cf. Eyre v. Berry, supra* (fact that majority of inhabitants are Republicans does not mean that defendant cannot obtain fair trial in libel action brought by Republican official).[21] Thus even if GAC's 98.5% figure is accepted as correct, we

20. At oral argument before this court GAC argued that the rents of these tenants would be reduced if their landlords were to receive the benefit of reduced electric bills. This is not a very realistic argument.

21. Indeed, acceptance of the proposition that every consumer of electricity supplied by PP&L should be deemed to have an interest adverse to GAC would constitute an acceptance of the proposition that all of the customers of all of the PJM member utilities and all of the customers of the Allegheny Coop member utilities would have such an adverse interest. *See* note 12 supra.

still must determine how many of those customers have an interest adverse to GAC.

GAC's argument is that all of the 98.5% have an interest adverse to it. However, we find this argument deficient in several respects.

Fundamental to the notion of interest as argued by GAC is the assumption that PP&L will pass any recovery back through to its customers either by reimbursement or reduced electric rates. This assumption is questionable, for its correctness depends upon a future decision by a third party, the PUC, which decision no one can predict with any certainty. Thus there can be no present benefit to PP&L customers but only the possibility of a future benefit. As such the customers' interest is speculative. See *Brittain v. Monroe County,* *supra* (interest of taxpayers speculative); *see also Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.,* 389 F.Supp. 568 (E.D.Va.1975) (possible interest in award contingent on future decision by state regulatory commission is speculative).

 Another questionable assumption in GAC's argument is that the benefit to PP&L customers would be substantial.[22] While GAC has argued that the benefit to each customer would be between $43.43 and $289.86, to take PP&L's low figures and GAC's high figures, *see* note 9 *supra*, the deposition testimony of Mr. O'Hara predicted that if the PUC did indeed rule that the recovery could go to PP&L

---

**22.** The fact that the benefit to each PP&L customer will be substantial represents an important part of GAC's argument. The alleged substantiality of the benefit is one way in which GAC attempts to distinguish a direct PP&L customer from a PJM or Allegheny Coop utility customer, *see* note 12 *supra*, one way in which it attempts to distinguish a public utility customer from a taxpayer, *see* note 24 *infra*, and one way in which it attempts to distinguish those cases adverse to its position. *See In re Virginia Electric & Power Co.,* 539 F.2d 357 (4th Cir. 1976); *Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.,* 389 F.Supp. 568 (E.D.Va.1975). Moreover, GAC does not directly make the broad argument that every public utility customer must be disqualified in every case involving the utility but asserts instead that the magnitude of the possible benefit to the customers in this case requires that the venue of the action be transferred.

customers, any such benefit could be spread over a period of years. Thus GAC's proof did not demonstrate that a venireman will immediately get a sum certain but only that a venireman who remains a PP&L customer may over a period of years receive some benefits in the form of reduced electric rates. This interest, unlike the interest of an employee or shareholder of a corporation,[23] is much like the interest of taxpayers whose taxes might be affected by their judgment as jurors in a case involving the county: "too shadowy, indirect, remote and contingent to be within the rule that a man cannot be a judge in his own case." *Brittain v. Monroe County, supra,* 214 Pa. at 651, 63 A. at 1077; *see Pennsylvania R.R. Co. v. City of Reading, supra,* 254 Pa. at 117, 98 A. at 793 (interest under Act of 1875 does not mean interest of a taxpayer).[24]

**23.** *See Seeherman v. Wilkes Barre Co.,* 255 Pa. 11, 99 A. 174 (1916) (shareholder of corporation incompetent to serve as juror in case in which corporation has interest); *Hufnagle v. Delaware & Hudson Co.,* 227 Pa. 476, 76 A. 205 (1910) (challenges for cause sustained against two panel members who were employees of defendant). A shareholder, unlike a public utility customer, has a direct ownership interest in the corporation and can reasonably be assumed to consider the interest of the corporation as his own.

**24.** The Supreme Court's decision in *Brittain v. Monroe County, supra,* that the interest of a taxpayer as taxpayer would not qualify as an adverse interest under the Act of 1875, 12 P.S. § 111, was consistent with two earlier statutes concerning taxpayers as jurors. The Act of 1834 provided:

No person shall be deemed incompetent to serve as a juror, in any suit or prosecution upon any official bond or forfeited recognizance, or upon any penal act of assembly, by reason of his being subject to any tax which would be diminished by the recovery which may be had in such a case.

Act of April 14, 1834, P.L. 333, § 151, 17 P.S. § 1172 (1962). The Act of 1840 provided:

No person shall be excluded from being a witness or juror in any suit, prosecution or proceeding in which any county, city, incorporated district, borough or township, is a party, or is interested, by reason of such person being or having been an officer, rated citizen or inhabitant in such county, city, district, borough or township, or owning assessed or taxable property, or being liable to the assessment or payment of any tax therein.

Act of April 16, 1840, P.L. 410, § 6, 17 P.S. § 1173 (1963). Both of these acts were repealed, effective June 27, 1978, by the Judiciary Repealer Act. 42 Pa.C.S. §§ 20002(a) [135], [169] (Supp.

■ Considering both the speculative nature of the benefit and the fact that its immediate impact may be insignificant, we must agree with PP&L that GAC's argument that the veniremen have an interest adverse to it is tenuous. In *In re Virginia Electric & Power Co.*, 539 A.2d 357 (4th Cir. 1976), the United States Court of Appeals for the Fourth Circuit was confronted with a situation similar to that with which we are confronted. The question was whether the district judge should have recused himself in a case where the electric utility (VEPCO) that served him was claiming $152,000,000 in damages, recovery of which could result in a refund of between $70 and $100 to the judge. In holding that recusal was not required, the Fourth Circuit compared the interest of the judge to a mere bare expectancy and stated:

> We are inclined to agree with the district court that $70 to $100 cash in hand is not *de minimis*. But when the possibility of recovering that amount is spread over the next 40 years, is dependent upon VEPCO winning the lawsuit and the full amount claimed, collecting the judgment, and the Virginia State Corporation Commission requiring VEPCO to return increased fuel costs to its customers, we doubt that anyone other than Jimmy the Greek would offer anything for the judge's chance. A reasonable man would doubtless prefer a $2 ticket at Churchill Downs on the first Saturday in May.

539 F.2d at 368.

1978). Section 5946 of the New Judicial Code, 42 Pa.C.S. § 5946, replaces them and is substantially similar to the Act of 1840.

GAC contends that the legislative exception for taxpayers is consistent with the valid public policy that the county should not have to bring every one of its actions in a different county. Citing the fact that there is a specific legislative exception for taxpayers, GAC argues that the interest of taxpayers is the *only* type of interest which is excepted and that any other type of interest should result in disqualification. This argument proves too much, for acceptance of it would lead to the conclusion that every public utility customer should be deemed to be interested. *See* note 21 *supra*. Moreover, it was not the fact that the jurors were taxpayers that led to the holding in *Brittain v. Monroe County, supra*, but the fact that their interest was too remote and contingent to result in disqualification.

*See also Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co., supra.*

 One other assumption critical to GAC's argument is that the Lehigh County veniremen believe, or, when the jury would be selected, would believe, that they will benefit from a recovery of damages by PP&L. GAC has offered no evidence that would support a finding of such a belief, as, for example, any newspaper reports or other types of publicity indicating that a recovery by PP&L would benefit its Lehigh County customers. *See Long Island Light Co. v. New England Petroleum Corp.,* 80 Misc.2d 183, 362 N.Y.S.2d 350 (1974) (newspapers reported that recovery by utility would result in rebate to utility's customers).[25] Moreover, we do not find it realistic to assume that every public utility customer automatically assumes that a recovery by a utility in a civil suit will inure to the benefit of the utility's customers.[26]

**25.** GAC contends that some of the evidence that will be admitted at trial will sow the seeds of prejudice in jurors who are PP&L customers by informing them that any recovery by PP&L would redound to the benefit of PP&L customers. The only example GAC presents of this type of evidence is the PP&L prospectus filed with the Securities and Exchange Commission on July 10, 1974, where PP&L allegedly admitted that it did not have a contract with GAC. The statement that GAC contends will sow the seeds of prejudice is as follows:

> Fuel Adjustment Clause. The Company's tariffs include fuel adjustment clauses which adjust prices for electric service to the Company's customers for variations in the cost of fuel used to generate electricity. Since fuel adjustment clause charges are based on average fuel costs for the three-month period ending the second month prior to the month of billing, increases in the level of fuel costs are not fully reflected in revenues from customers until four months after the increased level of fuel costs are charged to expense. The Company does not follow a practice of fuel cost deferral accounting and consequently, earnings for the twelve months ended April 30, 1974 were reduced by approximately 35 cents per share as a result of this four-month delay. Prices at which power is sold to neighboring utilities reflect the current price of fuel burned.
> Supp. R. at 34b.

We do not believe that this single paragraph, which is contained in a prospectus of many pages, would indicate to any juror that a recovery by PP&L would result in a benefit to a PP&L customer.

**26.** Mr. O'Hara testified that most people don't like utilities, R. at 702a., which is consistent with the observation by the court in

■ GAC argues, however, that it will be impossible to test the beliefs or knowledge of the Lehigh County Venire-men without specifically questioning them concerning their possible interest, thereby causing him to GAC because "[t]o even examine jurors concerning such an assumption on *voir dire* would raise the danger of unduly emphasizing prejudicial material." *Long Island Lighting Co. v. New England Petroleum Corp., supra* at 187, 362 N.Y.S.2d at 355. We recognize that sometimes, in questioning a panel of venire-men in order to determine whether there is prejudicial belief, counsel may risk sowing the seeds of the very prejudice he is asking about. Here, however, we are not persuaded that this risk is so substantial that venue must be changed. For example, it seems to us that a full explanation might be given by GAC, PP&L, or the lower court, informing the veniremen that any benefit to them is a mere possibility, depending on a ruling by the PUC, and that even if such a benefit were to be granted, it would probably be spread over a period of years. If after this explanation the court is satisfied from the veniremen's responses that they can try the case impartially, they should be permitted to sit as jurors. By combining questioning with a full explanation, GAC should be able to remove any preconception of a large benefit and replace it with knowledge that an individual's expectation of receiving anything is rather slight. Such knowledge should not in our view bar a juror from deciding the case impartially, just as a juror's knowledge that he is a taxpayer should not bar him from sitting in a case involving the taxing entity. *See Pennsylvania R.R. Co. v. City of Reading, supra; Brittain v. Monroe County, supra.* In making these remarks we do not presume to dictate to counsel. If the approach to *voir dire* that we have suggested is not satisfactory to counsel, we leave it to them and the lower court to find some means of dispelling any venire-

*Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co., supra,* that "[h]eretofore the complaint most often heard was that jurors would give inordinately high verdicts *against* utilities, since utilities 'had plenty of money' ". 389 F.Supp. at 571 (emphasis in original).

man's preconceptions, while at the same time avoiding the creation of prejudicial suspicions.[27]

GAC further argues that its application for a change of venue should be granted to avoid the appearance of impropriety. We agree with GAC that appearance may be significant, as " '[a]ny tribunal . . . must not only be unbiased but must avoid even the appearance of bias.' " *Gardner v. Repasky*, 434 Pa. 126, 129 , 252 A.2d 704, 706 (1969), *quoting Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968); *see Keystone Ins. Co. Appeal*, 224 Pa.Super. 404, 406, 307 A.2d 55, 56 (1973); *Donnon v. Downingtown Civil Service Comm.*, 3 Pa.Cmwlth. 366, 368, 283 A.2d 92, 93 (1971). However, we cannot find that a trial by a Lehigh County jury in this case would appear improper. GAC's argument that it would is based upon the assumption that the PP&L customers in Lehigh County have an interest in the case adverse to GAC, and we have held this interest to be too contingent, and possibly insignificant, to "raise [GAC's] contention of bias from the realm of speculation to the realm of fact." *Dennis v. United States*, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950).

GAC's final argument is that the possibility and appearance of prejudice, as shown on the record, are sufficient to require that venue be changed because they outweigh the interest of PP&L in having the case tried in the forum of its choosing.[28] This argument also must be rejected. As plaintiff PP&L had the right "to choose the place of

---

**27.** Given the high calibre of counsel for both sides, we expect full cooperation between them in any efforts to determine whether the veniremen have any prejudicial beliefs.

**28.** GAC argues that PP&L's interest in having this case tried in Lehigh County is very weak because the witnesses and sources of proof are scattered all over the nation, PP&L's trial counsel is in Philadelphia, the documentary evidence, because of discovery, is located in Philadelphia, and the costs of holding trial outside of Lehigh County will be negligible, particularly in view of the magnitude of this case. PP&L argues that because its corporate headquarters, files, and documents are in Lehigh County, its choice of Lehigh County as the forum for the action should be respected.

suit [and its] choice of a forum should not be disturbed except for weighty reasons.'" *Walker v. Ohio River Co.,* 416 Pa. 149, 152, 205 A.2d 43, 45 (1964), *quoting Plum v. Tampax, Inc.,* 399 Pa. 553, 561, 160 A.2d 549, 553 (1960). A change of venue may be required for such "weighty reasons" as are identified in the Act of 1875, but the question of whether an application for a change of venue should be granted is not decided by balancing the interests of the parties.[29] PP&L did not have to prove that its reasons for bringing the action in Lehigh County outweighed GAC's reasons for wanting the venue of the action changed; instead the burden was on GAC to prove that it was entitled to have the venue of the action changed.

GAC has particularly urged upon us the trial court's decision in *Long Island Lighting Co. v. New England Petroleum Corp., supra.* In that case Long Island Lighting Company (LILCO) brought an action in Nassau County against the New England Petroleum Corporation (NEPCO) seeking $62,000,000 in damages. LILCO provided power to 95% of the residents of Nassau County. The action was a result of the scarcity of fuel caused by the Arab oil embargo. LILCO also had brought an action for $186,000,000 treble damages in federal court against several oil companies based upon the same transaction. Newspapers, including the New York Times, the Wall Street Journal, and Newsday, had reported both actions and had carried a statement by a LILCO spokesman that any recovery would result in a direct rebate to LILCO customers. The reports did not distinguish between the state and federal actions with respect to the promised rebate. Faced with these facts, the trial court granted NEPCO's application for a change of venue.

**29.** GAC's arguments with respect to convenience and the necessity of having the trial in Lehigh County might be appropriate in support of an application for a change of venue under the doctrine of *forum non conveniens* as embodied in Rule 1006(d) of the Pennsylvania Rules of Civil Procedure. GAC has not made a *forum non conveniens* argument. Regarding the likelihood of such an argument being successful, *see Tarasi v. Settino,* 223 Pa.Super. 158, 298 A.2d 903 (1972).

We find this case distinguishable in the important respects that in it there was extensive publicity about the litigation and the newspapers had carried statements that a recovery would result in a rebate to LILCO customers. Thus there was both an atmosphere of prejudice, in a general sense, and the additional specific fact that the people of Nassau County had been informed that they had an interest in the case. Here, by contrast, there has been no extensive publicity prejudicial to GAC,[30] nor any statement to Lehigh County residents that they can expect a rebate if PP&L wins. *See County of Nassau v. Southside Hospital*, 89 Misc.2d 1063, 393 N.Y.S.2d 512 (1977) (distinguishes *Long Island Lighting v. New England Petroleum Corp., supra*, on several grounds including that there was extensive prejudicial publicity and that the financial ramifications of the case had been widely reported).

Neither are we persuaded by GAC's citation of *M & A Electric Power Cooperative v. Georger*, Mo., 480 S.W.2d 868 (1972), and *Ozark Border Electric Cooperative v. Stacy*, 348 S.W.2d 586 (Mo.App.1961). Those cases involved the disqualification of members of cooperatives, who, under Missouri law, were treated not only as customers but also shareholders in the cooperatives having "a direct interest of a proprietary nature" in the outcome of the litigation. *M & A Electric Power Cooperative v. Georger*, 480 S.W.2d at 873. *See Seeherman v. Wilkes Barre Co., supra.*

We therefore conclude that GAC failed to meet its burden of proof, and find no error in the lower court's denial of the application for change of venue under the fifth subsection of section 1 of the Act of 1875. It follows from this conclusion that GAC has also failed to prove that the lower court abused its discretion in denying the application for change of venue under subsections I and III of section 3

---

**30.** In its original application for change of venue GAC alleged prejudicial pre-trial publicity, *see* note 1 *supra*, but it has not raised a prejudicial publicity argument on this appeal, *see* note 3 *supra*. Moreover, the newspaper reports attached to GAC's original application were not nearly as prejudicial as those involved in *Long Island Lighting Co. v. New England Petroleum Corp., supra.*

of the Act. As has been discussed, under subsections I and III the lower court was empowered to "refuse or award such change of venue, as in its discretion it shall see fit." It is therefore more difficult for an appellant whose application for change of venue has been denied to show error under subsections I and III of section 3 than under the fifth subsection of section 1.

### 2

GAC's argument that the lower court has violated its right to due process of law as guaranteed by the fourteenth amendment of the United States Constitution also fails to persuade us.

While it is settled that "[t]he constitutional standard of fairness [under the due process clause] requires that a defendant have 'a panel of impartial, indifferent jurors,'" *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), *quoting Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), GAC has the burden of proving that it cannot obtain such a panel in Lehigh County. *See Irvin v. Dowd, supra*. GAC's argument with respect to due process, like its argument with respect to change of venue under the Act of 1875, depends upon its contention that the veniremen of Lehigh County have, and believe that they have, an interest in the case adverse to GAC. We have concluded, however, that GAC has not shown such an interest. While it is true that a violation of due process may be found where the tribunal has a pecuniary interest in the outcome of the case such that unfairness by the tribunal can be assumed, *see Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927),[31] we will not assume unfairness, and therefore will not find a violation of due process, where the only interest shown is a speculative and

31. In *Tumey v. Ohio, supra,* the Supreme Court held that a due process violation occurred where the mayor of the village was permitted to retain court costs if he found the defendant guilty in the mayor's court.

perhaps insignificant possibility of some future benefit.[32] As to GAC's concern that some of the PP&L customers believe that they will benefit, this belief, if indeed it does exist, is something that we believe can be satisfactorily discovered on *voir dire*.[33]

Affirmed.

VAN der VOORT, J., concurs in the result.

WIEAND, J., did not participate in the consideration or decision in this case.

---

**32.** In *Tumey v. Ohio, supra,* the Supreme Court stated that the disqualifying interest must be "direct, personal, substantial and pecuniary" and not "remote, trifling and insignificant." 273 U.S. at 523, 531, 47 S.Ct. at 441, 444.

**33.** PP&L argues that the right to challenge a prospective juror after *voir dire* defeats GAC's argument that its right to due process has been violated. PP&L points out that the cases relied upon by GAC all involved situations where there was no right to challenge the fact finder. *See Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (arbitration panel member with adverse interest); *Tumey v. Ohio, supra* (mayor as judge); *Horn v. Township of Hilltown,* 461 Pa. 745, 337 A.2d 858 (1975) (zoning board member); *Schlesinger Appeal,* 404 Pa. 584, 172 A.2d 835 (1961) (disbarment committee).